UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Anna Doe,<br><br>               Plaintiff<br><br>— against —<br><br>The City of New York, Detective Richard Hall, Detective Eddie Martins, Sergeant John Espey, Police Officer Gregory Markov, and John Doe Officers 1 to 8,<br><br>               Defendants. | **18-cv-670 (ARR) (JO)**<br><br><br>**Not for publication**<br><br><br>**Opinion & Order** |

ROSS, United States District Judge:

Anna Doe alleges that New York City Police Department Detectives Richard Hall and Eddie Martins took her into police custody, repeatedly raped her in the back of a police van, and then released her without charging her with any crime. Later that same evening, Doe went to Maimonides Hospital to seek treatment. A number of police officers, including Officer Gregory Markov, responded to the hospital when they heard that Doe was complaining that plainclothes police officers had raped her. Markov and the John Doe Officers "bullied, threatened and intimidated" Doe in an attempt to prevent her from filing a complaint, questioning whether she had in fact been raped and whether her alleged assailants were actually police officers.

Doe filed suit in Kings County Supreme Court against Detectives Hall and Martins, their supervisor Sergeant John Espey, the police officers who responded to the hospital, and the City of New York. The City removed this complaint to federal court, and is now moving to dismiss all claims against the City, Officer Markov, and the John Doe Officers. (The City is not representing Sergeant Espey or Detectives Hall and Martins.) Sergeant Espey, who is being represented by counsel from the Sergeants Benevolent Association, is also moving to dismiss all claims against

him. Detectives Hall and Martins, who have resigned from the police force and are currently facing criminal charges in Kings County Supreme Court, do not join in the motion to dismiss.

For the following reasons, Sergeant Espey's motion to dismiss is granted in its entirety. The City and Officer Markov's motion to dismiss is granted in part and denied in part.

## BACKGROUND[1]

### A. The Events of September 15, 2017

On September 15, 2017, at about 8:00 p.m., Anna Doe was in Calvert Vaux Park in Brooklyn when Detectives Hall and Martins detained and arrested her "without just cause or provocation," placing her in the back of an unmarked police van. Third Am. Compl. ¶ 13, ECF No. 42 ("Compl."). Hall and Martins drove Doe to the parking lot of a Chipotle Restaurant, where they raped her. *Id.* ¶ 14. They then drove around Brooklyn, raping Doe as they went. *Id.* ¶ 15. When they were done, they released Doe near the 60th Precinct, without charging her with any crime. *Id.* ¶¶ 16–17. Hall and Martins were assigned to the Brooklyn South Narcotics unit at the time of this incident, and were working under the supervision of Sergeant Espey. *Id.* ¶ 10.

Later that night, accompanied by her mother, Doe went to Maimonides Hospital to seek treatment for the injuries she sustained as a result of this incident. *Id.* ¶¶ 37, 44. She told hospital staff that two plainclothes police officers had raped her. *Id.* ¶ 38. Hospital personnel relayed this information to the NYPD. *Id.* ¶ 39. A number of police officers responded to the hospital, including Officer Gregory Markov. *Id.* ¶¶ 40, 42. Doe told several officers, including Markov, "that she wished to press charges against the two plainclothes police officers." *Id.* ¶ 42.

Markov and these other officers then "pressured, bullied, threatened and intimidated" Doe "in an attempt to prevent [her] from implicating . . . police officers in the sexual assault." *Id.* ¶ 43.

---

[1] For the purpose of this motion, I assume the truth of the factual allegations of Doe's complaint.

Markov repeatedly told Doe and her mother in Russian that "the two plainclothes police officers were not real police officers and that he was aware that [Doe] made the same complaints previously about other police officers." *Id.* ¶ 47. (Markov, like Doe and her mother, speaks Russian. *Id.* ¶¶ 45–46.) He also repeatedly insisted that Doe had "the story wrong," she "was not raped by police officers," and she "did not know what she was talking about." *Id.* ¶¶ 48–49. Doe alleges that Markov did all of this to prevent her "from submitting to a medical exam and rape kit," and to keep her "from pressing charges against the two plainclothes police officers." *Id.* ¶ 50.

### B. Brooklyn South Narcotics

This is not the first reported case of on-duty sexual misconduct by officers assigned to Brooklyn South Narcotics. Plaintiff alleges that newspaper articles show a pattern of sexual misconduct by officers assigned to this command over the course of the past 20 years.

According to a 2011 newspaper article detailing a police corruption trial, multiple officers assigned to this command supplied crack cocaine to a drug user "and forced her to perform sex acts . . . in return." *Id.* ¶¶ 25–26. A 2008 newspaper article revealed that 15 police officers from this command "were placed on desk duty as a result of a five-month investigation by the NYPD's Internal Affairs Bureau, which revealed a widespread practice of officers in that unit trading drugs for sexual favors with informants and prostitutes." *Id.* ¶ 27. As a result of this same investigation, "the Police Commissioner transferred the commanding officer of citywide narcotics, the head of Brooklyn South Narcotics . . . and two captains in the unit." *Id.* ¶ 28. Finally, a 2003 article revealed that a female police lieutenant was suing her former superiors in the NYPD over the "constant abuse" she endured during her time in the "frat house" environment of Brooklyn South Narcotics. *Id.* ¶ 29. She alleged that officers in this unit, among other things, "guzzled beer, surfed the internet for hardcore pornography and pasted pictures of nude women on the walls." *Id.*

### C. Procedural history

After the City removed this action to the Eastern District of New York, Doe filed her first amended complaint. First Am. Compl., ECF No. 8. A month later, the City requested a pre-motion conference regarding an anticipated motion to dismiss. Letter from Ariel Lichterman (Apr. 10, 2018), ECF No. 16. Plaintiff then filed a second amended complaint, Second Am. Compl., ECF No. 23, "in order to obviate the need for the Court's intervention," Letter from Michael N. David (Apr. 17, 2018), ECF No. 24. Plaintiff's counsel stated that he "believe[d] that the second amended complaint addresses the issues raised by defense counsel." *Id.* The City then filed a renewed request for a pre-motion conference. Letter from Ariel Lichterman (Apr. 19, 2018), ECF No. 27. Plaintiff filed a responsive letter. Letter from Michael N. David (Apr. 30, 2018), ECF No. 28. Two weeks later, Sergeant Espey sought to join the City's request for a pre-motion conference, without providing any factual or legal grounds for this request. Letter from Matthew K. Schieffer (May 14, 2018), ECF No. 39. Two days after that, I held a telephonic pre-motion conference with counsel for Doe, the City, and Espey, where I set a briefing schedule and discussed what I viewed as the pleading defects with regard to plaintiff's complaint. Plaintiff subsequently filed a third amended complaint. The present motions to dismiss followed.

The third amended complaint lists seven causes of action: (1) False arrest and imprisonment against Hall, Martins, and the City; (2) Assault, sexual assault, and battery against Hall, Martins, and the City; (3) Negligent hiring, retention, and supervision against the City; (4) Negligent supervision against Espey; (5) Violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments under 42 U.S.C. § 1983 against all defendants; (6) Intentional infliction of emotional distress against Hall, Martins, Markov, the John Doe Officers, and the City; and (7) First Amendment retaliation against Hall, Martins, Markov, the John Doe Officers, and the City.

The defendants (other than Detectives Halls and Martins) are moving to dismiss all seven causes of action for failure to state a claim. I will discuss each cause of action in turn.

## DISCUSSION

In deciding a motion to dismiss under Rule 12(b)(6), this court must "accept[] all factual allegations in the complaint as true" and "draw[] all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). Nonetheless, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 476 (2d Cir. 2009). Further, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). A court can, however, consider materials outside the complaint on a 12(b)(6) motion in some limited circumstances. *Id.* For example, a district court can consider the full text of documents that are quoted in the complaint or "documents relied upon by [the] plaintiff in drafting the complaint and integral to the complaint." *Id.* A court can also consider "matters of which judicial notice may be taken." *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002). But "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."

*Id.* Moreover, if other "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed. R. Civ. P. 12(d).

## I. The motion to dismiss plaintiff's *respondeat superior* claim against the City for false arrest and imprisonment is denied.

The City moves to dismiss the false arrest claim against it on two separate grounds.[2] The City first argues that the "barebones and conclusory statements" in the complaint that Doe was arrested without probable cause do not make out a plausible claim for relief. Mem. of Law in Supp. of Mot. to Dismiss by Defs. City of New York & Gregory Markov 6, ECF No. 50 ("City Mem. of Law"). The City's second argument relies on excerpts from Doe's testimony at a "50-h hearing" held under New York General Municipal Law Section 50-h. *See id.* at 8 (citing Decl. of Ariel Lichterman in Supp. of Mot. to Dismiss, Ex. B, ECF No. 49-2 ("50-h hr'g tr.")). Specifically, the City argues that Doe's "own testimony [at the 50-h hearing] confirms that there was reasonable suspicion for the initial stop of her vehicle and probable cause for her arrest." *Id.* at 6. Because the car stop and arrest were lawful, the City contends, it "cannot be liable on a theory of *respondeat superior*." *Id.* at 6–9.

Under New York law and § 1983, the elements of a false arrest or false imprisonment claim are "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (false arrest); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (false imprisonment). Under both state law and § 1983, an arrest is "privileged" if it "was based on probable cause," but "the

---

[2] Although the plaintiff does not specify whether she brings the first two causes of action under state or federal law, *see* Compl. ¶¶ 61–69, I assume that they are brought under state law only as she lists a separate cause of action bringing various constitutional claims against all defendants under § 1983.

defendant[] bear[s] the burden of proving that probable cause existed for the plaintiff's arrest." *Savino*, 331 F.3d at 76 (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994), and *Broughton v. State*, 335 N.E. 2d 310, 315 (N.Y. 1975)); *accord Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

Although a § 1983 claim for false arrest is "substantially the same as a claim for false arrest under New York law," *Weyant*, 101 F.3d at 852, there is one difference that is relevant here. Under federal law, probable cause is a complete defense regardless of whether a police encounter was justified at its inception. In other words, even if an initial *Terry* stop or car stop is unlawful, as long as the officers develop probable cause by the time of the arrest, a false arrest claim will not lie under § 1983. *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) ("The fruit of the poisonous tree doctrine . . . is inapplicable to civil § 1983 actions."); *accord, e.g.*, *Jenkins v. City of New York*, 478 F.3d 76, 91 n.16 (2d Cir. 2007); *Ikezi v. City of New York*, No. 14-CV-5905 (MKB), 2017 WL 1233841, at *5 (E.D.N.Y. Mar. 31, 2017). Under state law, on the other hand, a civil defendant cannot raise a defense of probable cause to a false arrest claim if the arrest was the result of an initially unlawful search or seizure. *Gantt v. County of Nassau*, 651 N.Y.S.2d 541, 542 (N.Y. App. Div. 1996); *Ostrover v. City of New York*, 600 N.Y.S.2d 243, 244–45 (N.Y. App. Div. 1993); *Tetreault v. State*, 108 A.D.2d 1072, 1073–74 (N.Y. App. Div. 1985); *see also Fakoya v. City of New York*, 115 A.D.3d 790, 791 (N.Y. App. Div. 2014) ("Evidence which is illegally obtained in violation of a plaintiff's rights may not be used to establish probable cause.").[3]

_____

[3] Some courts have suggested that this line of cases has been called into question by the New York Court of Appeals' decision in *Martinez v. City of Schenectady*, 761 N.E.2d 560 (N.Y. 2001). *See Hatcher v. City of New York*, 15-CV-7500 (VSB), 2018 WL 1583036, at *3 (S.D.N.Y. Mar. 27, 2018); *Cabral v. City of New York*, 662 F. App'x 11, 13 (2d Cir. 2016) (summary order). In *Martinez*, the court relied in part on evidence that had been suppressed in the underlying criminal case (due to a defective search warrant application) in holding that the false arrest claim failed in the civil case because officers had probable cause to arrest the plaintiff. 761 N.E.2d at 565. But *Martinez* does not make clear in its discussion whether any of the suppressed evidence was *necessary* to its finding of probable cause in the civil case. The non-suppressed evidence included "the officers' prior identification of the

## A. The factual allegations of the complaint are sufficient to state a claim.

The City's first argument fails because, although the factual allegations of the complaint are barebones, they are enough "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Under New York law, arrests without a warrant are presumed to be unlawful, and "the defendant has the burden of proving legal justification as an affirmative defense." *Broughton*, 335 N.E. 2d at 315. Thus, merely alleging that Doe was arrested "without just cause or provocation," Compl. ¶ 13, is sufficient to survive a motion to dismiss. *See Hoegemann v. Palma*, No. 3:16-cv-1460 (VAB), 2017 WL 455930, at *12 (D. Conn. Feb. 2, 2017).

## B. The City's second argument for dismissal fails for two separate reasons.

### 1. Doe's 50-h hearing testimony cannot be considered on a motion to dismiss.

As an initial matter, the City's second argument fails because it relies on Doe's 50-h testimony, which I cannot consider on a motion to dismiss. As the City notes, there are a number of cases from this district where courts have considered a plaintiff's 50-h hearing testimony on a motion to dismiss. City Mem. of Law 4-5 (citing cases). But the greater weight of authority in this circuit excludes 50-h hearing testimony from consideration on a motion to dismiss unless there is evidence that the plaintiff relied on the 50-h hearing testimony in drafting her complaint. *See, e.g.*, *Gaston v. Ruiz*, No. 17-CV-1252 (NGG) (CLP), 2018 WL 3336448, at *3 (E.D.N.Y. July 6, 2018); *Weaver v. City of New York*, No. 13-cv-20 (CBA) (SMG), 2014 WL 950041, at *4 (E.D.N.Y. Feb. 11, 2014); *Fontanez v. Skepple*, No. 12-CIV-1582 (ER), 2013 WL 8426000, at *2-3 (S.D.N.Y. Mar.

---

searched premises as a suspected drug distribution point," cocaine purportedly purchased from the plaintiff by a confidential informant, and that "informant's recorded telephone call to plaintiff." *Id.* This non-suppressed evidence, standing alone, would have provided probable cause to arrest the plaintiff. Therefore, I do not read *Martinez* as implicitly overruling the Appellate Division's decisions in *Gantt*, *Ostrover*, and *Tetreault*. Furthermore, the 2014 decision in *Fakoya* reaffirms that this doctrine remains good law in the Second Department, where the present incident took place.

6, 2013). Indeed, even one of the cases cited by the City took the 50-h hearing testimony into account only because the court found that the 50-h hearing testimony was "'relie[d upon] heavily . . . [in] terms and effect, [and] thereby render[ed] . . . integral' to the Amended Complaint." *Eliot-Leach v. New York City Dep't of Educ.*, 201 F. Supp. 3d 238, 242 (E.D.N.Y. 2016) (alterations in original) (citations omitted). Here, Doe "has not referred to her 50-h testimony in the complaint, nor is there reason to believe that [she] relied on the transcript of her testimony in filing the complaint." *Weaver*, 2014 WL 950041, at *4. Therefore, although plaintiff relies on this testimony in her memorandum of law responding to the City's motion to dismiss, I conclude that I cannot consider Doe's 50-h hearing testimony on a motion to dismiss. *See Chambers*, 282 F.3d at 153 ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion.").

Moreover, even if I did consider Doe's 50-h hearing testimony on the motion to dismiss— or converted the motion to dismiss into a summary judgment motion as the City requests in the alternative—this testimony does not require dismissal of Doe's state-law false arrest claim.

      2. *Even if I considered Doe's 50-h hearing testimony, a false arrest claim would still lie because she plausibly alleges that the initial car stop was unjustified.*

Doe testified at her 50-h hearing that she drove to Calvert Vaux Park on September 15, 2017, to "smoke pot" with some friends. 50-h hr'g tr. 179–80. When she pulled into the parking lot at about 8:00 p.m., it was already dark, but she saw that the gate to a dirt road leading to the soccer fields in the back of the park was open. *Id.* at 185, 187. (Calvert Vaux Park is open at night, but Doe knows from past experience that the gate to this dirt road is usually closed at night. *Id.* at 185, 187.) As she drove down the dirt road, an unmarked car began to follow her. *Id.* at 185. This car then turned on its sirens and she pulled over. *Id.* at 186. When Hall and Martins approached her car, she had marijuana out in "plain sight" in the cup holder. *Id.* at 211. A detective who shined

a flashlight into the car could see the marijuana. *Id.* at 217. The detectives told Doe and her two passengers to get out of the car so they could search it for drugs. *Id.* A detective then proceeded to search Doe's bag, which was in the car, and asked to whom it belonged. *Id.* at 218. Doe acknowledged that it was her bag and that this bag contained "weed and two Klonopins." *Id.*

Even assuming that, before placing Doe under arrest, the officers acquired probable cause to arrest her for drug possession, Doe is not foreclosed from bringing a false arrest claim under state law if the initial car stop was unlawful. *See Gantt*, 651 N.Y.S.2d at 542 ("The basis for [the] stop of the plaintiffs' vehicle is in dispute. If the information that led to the plaintiffs' arrest was the product of an unlawful stop, then [the defendant's] conduct was not privileged or justified.").

Contrary to the City's contention, Doe's 50-h hearing testimony does not establish that Hall and Martins possessed the requisite reasonable suspicion that Doe was committing a crime or traffic violation justifying the stop of her car. *See United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009). The City is correct that it is a violation of park regulations "to remain in a park closed to the public." City Mem. of Law 7 (citing 56 R.C.N.Y. § 1-03). But park regulations also state that "[p]ersons may enter and use the park from 6:00 a.m. until 1:00 a.m. unless other open hours are posted at any park." 56 R.C.N.Y. § 1-03(a)(1). Doe entered Calvert Vaux Park at 8:00 p.m. and, according to her 50-h testimony, knew that the park is open at night. 50-h hr'g tr. 187. As well, although she drove down a park road that was typically closed at night, the gate to this road was open. *Id.* at 185, 187, 208. Finally, that Doe had gone to the park to "use illicit drugs," City Mem. of Law 8, is not relevant to whether the police reasonably suspected illegality justifying the car stop: the police officers had no way of knowing this before stopping Doe's car. Taking Doe's account of events as true and drawing all reasonable inferences in her favor—as I must on a

motion to dismiss—she was simply driving down an open road of an open park at night. No facts available to the police gave rise to reasonable suspicion that Doe was committing a crime.

Accordingly, I deny the City's motion to dismiss the state-law false arrest claim because, even if I were to consider Doe's 50-h testimony, the plaintiff raises a plausible claim for relief.

## II. The City's motion to dismiss plaintiff's *respondeat superior* claim for sexual assault is granted because sexual assault is outside the scope of employment.

The City moves to dismiss the *respondeat superior* claims against it for sexual assault and battery, arguing that it is not vicariously liable for Hall and Martins's conduct because rape and sexual assault are outside the scope of employment. City Mem. of Law 9–11. The City is correct. "Under the doctrine of respondeat superior, an employer may be vicariously liable for the tortious acts of its employees only if those acts were committed in furtherance of the employer's business and within the scope of employment." *N.X. v. Cabrini Med. Ctr.*, 765 N.E.2d 844, 847 (N.Y. 2002). Sexual assault "is not in furtherance of [an employer's] business and is a clear departure from the scope of employment, having been committed for wholly personal motives." *Id.* For this reason, the City cannot be held vicariously liable for the sexual assaults Hall and Martins allegedly committed against Doe, even though the detectives were then on duty. *Noonan v. City of New York*, No. 14CV4084-LTS-JLC, 2015 WL 3948836, at *7 (S.D.N.Y. June 27, 2015); *Doe v. City of New York*, No. 09 Civ. 9895(SAS), 2013 WL 796014, at *4–5 (S.D.N.Y. Mar. 4, 2013).[4]

---

[4] Moreover, plaintiff has abandoned this claim by failing to contest the City's argument that rape cannot give rise to *respondeat superior* liability. *See Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003))). Plaintiff's only response to this argument comes in a section heading that argues that the second and third causes of action—the *respondeat superior* claim for rape and the negligence claim against the City—"should be sustained." Mem. of Law in Opp. of the Mot. to Dismiss by Defs.' City of New York & Gregory Markov 5, ECF No. 51 ("Pl.'s Resp. to City"). But the body text of this section of plaintiff's brief addresses only the issue of negligent hiring, retention, or supervision. *See id.* at 5–14.

**III. The City and Espey's motion to dismiss plaintiff's negligence claims is granted because the plaintiff has not pleaded plausible factual allegations that either defendant knew or should have known of the detectives' propensities.**

Under New York law, the tort of negligent hiring, retention, or supervision "applies equally to municipalities and private employers." *Gonzalez v. City of New York*, 17 N.Y.S.3d 12, 15 (N.Y. App. Div. 2015). On this tort theory, "an employer may be liable for the acts of an employee acting outside the scope of his or her employment." *Id.* To state a claim for negligent hiring or supervision, "in addition to the standard elements of negligence, a plaintiff must show:"

1) that the tort-feasor and the defendant were in an employee-employer relationship;

(2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence; and

(3) that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (citations omitted).

Alternatively, an individual can be held negligent for breaching "a duty to the general public to control the conduct of another to prevent that person from harming others" if two conditions are met. *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 383–84 (E.D.N.Y. 2009). "[T]he two requirements for triggering this duty are: (1) sufficient knowledge of the danger posed by the third person; and (2) sufficient ability to control the relevant conduct of the third person." *Id.* at 384.

Doe failed to plausibly allege that Espey or the City was negligent on either theory for essentially the same reason: She has not pleaded factual allegations that make it plausible that the City or Espey knew or should have known of Hall and Martins's propensity to commit sexual assaults—or that Espey knew of the danger that these detectives posed to the public. Although Doe provides factual allegations of sexual misconduct by other Brooklyn South Narcotics officers, Compl. ¶¶ 25–29, she provides no specific allegations of prior sexual misconduct by Hall or

Martins that would have put Espey or the City on notice that either detective posed a danger. Instead, she alleges only that Hall and Martins "engaged in a pattern or practice of sexually assaulting females in their custody," *id.* ¶ 30; that Hall and Martins have a "prior history of [sexually] assaulting females in their custody," *id.* ¶ 34; and that the City "was deliberately indifferent to such pattern or practice," *id.* ¶ 32. These are the type of "conclusory statements" that I am not "bound to accept as true" on a motion to dismiss and that "do not suffice" to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Since Doe does not provide any factual allegations of prior sexual misconduct by Hall and Martins, she has not plausibly alleged all the elements of a negligence claim against either Espey or the City.

**IV. Espey's motion to dismiss plaintiff's § 1983 claim is granted because the plaintiff has not pleaded factual allegations that make plausible Espey's personal involvement in the deprivation of plaintiff's constitutional rights.**

There is no vicarious liability under § 1983: "§ 1983 requires individual, personalized liability on the part of each government defendant." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014). But, although "each government official . . . is only liable for his or his own misconduct," there are several ways that supervisors can be held liable. *Id.* (quoting *Iqbal*, 556 U.S. at 677 (alteration in original)). As relevant here, a supervisory defendant can have "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). A defendant can also be "grossly negligent in supervising subordinates who committed the wrongful acts." *Id.* A supervisory defendant "is not grossly negligent, however, where the plaintiff fails to demonstrate that the supervisor knew or should have known of a problematic pattern of employee actions or where the supervisor took adequate remedial steps immediately upon learning of the challenged conduct." *Id.* at 117 (citations omitted). Further, "[a] plaintiff pursuing

a theory of gross negligence must prove that a supervisor's neglect *caused* his subordinate to violate the plaintiff's rights in order to succeed on her claim." *Id.* (emphasis added).

Doe has not pleaded any factual allegations that support a plausible claim for relief under either theory as to Espey. The only factual allegation in the complaint relating to Espey's involvement in this incident is that, at all relevant times, Espey supervised Hall and Martins. Compl. ¶ 10. Plaintiff also states that Espey "had, or should have had, knowledge of the illegal and improper conduct of his subordinates, . . . and [that he] failed to exercise reasonable care by permitting such improper and illegal conduct to occur and continue, and by failing to take other corrective measures." *Id.* ¶ 76. But, again, this is the type of conclusory assertion that I am "not bound to accept as true" and that "do[es] not suffice" to state a claim for relief. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, Doe has not plausibly alleged that Espey was grossly negligent. Moreover, although the complaint alleges prior sexual misconduct by other members of Brooklyn South Narcotics, Compl. ¶¶ 25–29, this is not sufficient to plausibly allege that Sergeant Espey personally "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." *Colon*, 58 F.3d at 873.[5]

### V. The City's motion to dismiss plaintiff's § 1983 claim is granted because the factual allegations of the complaint do not plausibly allege a *Monell* claim.

Even though a municipality "cannot be held liable on a *respondeat superior* basis for the tort of its employee," it "can be held liable under section 1983 if the deprivation of the plaintiff's

---

[5] Plaintiff notes in her briefing that news articles have reported (a) that Espey was on the phone with Hall while Doe was being raped in the back of the van, (b) that Hall and Martins left an undercover narcotics operation supervised by Espey to go to Calvert Vaux Park, and (c) that Espey was stripped of his gun and badge for his failure to supervise his subordinates. Mem. of Law in Opp. of the Mot. to Dismiss by Def. Sergeant John Espey 7, ECF No. 54 ("Pl.'s Resp. to Espey"). None of this information, however, is contained or referred to in her complaint. Thus, for purposes of a motion to dismiss, I cannot consider any of this information. *See Chambers*, 282 F.3d at 153.

rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Dep't of Soc Servs.*, 436 U.S. 658, 690–91 (1978)). There are four types of practices that permit a § 1983 suit against a municipality: (1) a formally adopted municipal policy; (2) the actions or decisions of a municipal official with final policymaking authority; (3) "a practice so persistent and widespread that it constitutes a custom or usage"; and (4) "a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference." *Cordero v. City of New York*, 282 F. Supp. 3d 549, 563 (E.D.N.Y. 2017) (quoting *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 204 (S.D.N.Y. 2013)).

When plaintiffs do not allege an unconstitutional official policy, or an unconstitutional action ordered or ratified by an official policymaker, "municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." *Amnesty Am v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). This requires a showing that policymaking officials were deliberately indifferent. *Id.* Thus, in order to make out a failure to supervise claim, plaintiffs must show that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." *Id.* at 128 (citation omitted). In order to make out a failure to train claim, plaintiffs must "establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also . . . identify a specific deficiency in the city's training program and establish that that deficiency is 'closely

related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." [6] *Id.* at 129 (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). In other words, "the official made a conscious choice, and was not merely negligent." *Jones*, 691 F.3d at 81 (citations omitted).

In her complaint, Doe alleges two "patterns or practices" giving rise to municipal liability. The first is that "officers in the employ of the NYPD, including . . . officers assigned to the Brooklyn South Narcotics Unit, engaged in a pattern or practice of engaging in sexual contact with females in their custody." Compl. ¶ 22. The second is that NYPD officers threatened and intimidated the victims of such sexual contact as "part of a widespread pattern or practice . . . to prevent victims of such sexual assaults from reporting [the] same to the authorities." *Id.* ¶ 53. Neither states a plausible *Monell* claim on any legal theory.

The first two categories of *Monell* liability are irrelevant here as plaintiff does not allege that Hall and Martins's actions were undertaken pursuant to a formal municipal policy or that these actions were ordered or ratified by a municipal policymaker. She also does not allege any prior incidents, let alone a formal policy, of police officers threatening and intimidating the victims of sexual assaults in order to prevent them from coming forward. Nor does plaintiff plausibly allege that there was a pattern of officers sexually assaulting individuals in police

---

[6] Although there is dicta in *Amnesty America* "that suggests that conclusory allegations about a municipality's failure to train its employees may be sufficient" to survive a motion to dismiss, this no longer holds true in light of the Supreme Court's subsequent decisions in *Iqbal* and *Twombly*. *Simms v. City of New York*, No. 10-CV-3420 (NGG)(RML), 2011 WL 4543051, at *2 n.3 (E.D.N.Y. Sept. 28, 2011), *aff'd* 480 F. App'x 627, 630–31 (2d Cir. 2012); *accord, e.g., Doe*, 2013 WL 796014, at *2 n.28. Instead, a plaintiff must "plausibly allege a specific deficiency in the municipality's training." *Tieman v. City of Newburgh*, No. 13-CV-4178 (KMK), 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015).

custody that was "sufficiently persistent or widespread as to acquire the force of law." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007). Indeed, none of the incidents of prior sexual misconduct by Brooklyn South Narcotics officers alleged in the complaint involved individuals in police custody. *See* Compl. ¶¶ 25–29. Doe argues that, due to the inherent power dynamics of the relationship between police officers and arrestees, "[w]hen on duty police [request] to trade sex for drugs or anything else that is spelled rape." Pl.'s Resp. to City 22. But trading drugs for sex is simply not the same thing as sexually assaulting someone in police custody.

Moreover, viewing this case as part of a pattern of sexual misconduct sufficiently persistent or widespread to constitute a custom, this is not a case where "a local government is faced with a pattern of misconduct and does nothing." *Reynolds*, 506 F.3d at 192. Instead, the complaint alleges that an Internal Affairs investigation resulted in 15 Brooklyn South Narcotics officers being "placed on desk duty," Compl. ¶ 27, as well as the transfer of "the commanding officer of citywide narcotics, the head of Brooklyn South Narcotics . . . and two captains in the unit," *id.* ¶ 28. Nor, for essentially the same reason, does Doe plausibly allege a failure to supervise *Monell* claim: she does not allege facts that support a reasonable inference of a "failure to investigate or rectify" a "potentially serious problem of unconstitutional conduct" that "evidences deliberate indifference." *Amnesty Am.*, 361 F.3d at 128.

Finally, Doe does not plausibly allege a failure to train *Monell* claim because she does not identify a training deficiency that "'actually caused' the constitutional deprivation"—here, her sexual assault. *Id.* at 129. While this is not the first time an on-duty New York City police officer stands accused of rape, *see Doe*, 2013 WL 796014, plaintiff provides no reason to believe that this behavior was caused by a failure to properly train officers. Indeed, deciding not to rape someone

is not the kind of "difficult choice of the sort that training or supervision will make less difficult." *Id.* at *4 (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992)).

### VI. The defendants' motion to dismiss plaintiff's intentional infliction of emotional distress claim is granted because (a) Markov's conduct was not sufficiently "extreme and outrageous," and (b) the City cannot be sued on this ground.

An intentional infliction of emotional distress claim has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Chanko v. Am. Broad. Cos.*, 49 N.E.3d 1171, 1178 (N.Y. 2016) (quoting *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). Notably, the New York Court of Appeals has never found a defendant's conduct to be sufficiently extreme and outrageous to meet the first element. *Id.* at 1179. Thus, for example, broadcasting the last minutes of someone's life without their consent, publishing unauthorized photographs of patients in a psychiatric hospital, or broadcasting "recognizable images of rape victims after repeatedly assuring them that they would not be identifiable" have all been held to be insufficiently extreme and outrageous to state an IIED claim. *Id.* Indeed, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 1178 (quoting *Howell*, 612 N.E.2d at 702).

Markov's alleged conduct here, although troubling, was insufficiently extreme and outrageous to state a plausible claim for relief. According to the complaint, "Markov repeatedly stated . . . that the two plainclothes police officers were not real police officers and that he was aware that plaintiff made the same complaints previously about other police officers." Compl. ¶ 47. He also told plaintiff and her mother that Doe had "the story wrong," was "not raped by

police officers," and "did not know what she was talking about." *Id.* ¶¶ 48–49. Even assuming that these statements were lies, intended to prevent Doe "from reporting the assault to authorities," *id.* ¶ 46, Markov's comments were not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Cf., e.g.*, *J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 (E.D.N.Y. 2017) (holding that Muslim arrestee stated a plausible IIED claim when she alleged that ten male officers made her remove her headscarf, which she viewed as akin to being forced to strip naked, "in their presence and the presence of five male detainees . . . in violation of NYPD policy and despite Plaintiff's repeated objections . . . , and then made sarcastic and demeaning comments about her physical features"). The IIED claim against Markov must therefore be dismissed. The IIED claim against the John Doe Officers must also be dismissed because the only factual allegation against them is that, along with Markov, they "pressured, bullied, threatened and intimidated" Doe "in an attempt to prevent [her] from implicating NYPD police officers in the sexual assault." Compl. ¶ 43; *see also id.* ¶ 52.

The intentional infliction of emotional distress claim against the City fails for another reason. "[P]ublic policy bars claims sounding in intentional infliction of emotional distress against a governmental entity." *J.H.*, 248 F. Supp. 3d at 416 n.10 (quoting *Noonan*, 2015 WL 3948836, at *7); *accord, e.g.*, *Lauer v. City of New York*, 659 N.Y.S.2d 57, 58 (N.Y. App. Div. 1997).

**VII. The motion to dismiss plaintiff's First Amendment retaliation claim against Markov is denied because, contrary to the City's contentions, such a claim does not require Doe to show that her speech or conduct was actually chilled.**

Finally, the City moves to dismiss plaintiff's First Amendment retaliation claim "because she has not alleged that her speech has been chilled in any manner." City Mem. of Law 24. This argument fails as it relies on a statement of law regarding the elements of First Amendment retaliation that the Second Circuit has since disavowed. Instead, as discussed below, to state a

First Amendment retaliation claim in this circuit a private citizen like Doe must demonstrate only that she was retaliated against for exercising her First Amendment rights and that this retaliation caused her "some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). The emotional distress that Doe alleges she suffered as a result of Markov's aggressive and repeated attempts to dissuade her from filing a complaint that she had been raped by police officers, mere hours after Detectives Hall and Martins allegedly raped her in the back of a police van, is sufficient to meet this requirement.[7]

### A. Doe must show only that she suffered "some injury," not a chilling of speech.

First Amendment retaliation claims typically arise in three distinct contexts: prisoners, public employees, and criticism of public officials by private citizens. The Second Circuit has traditionally applied one test to the First Amendment retaliation claims of prisoners and public employees and another, more stringent, test to the First Amendment retaliation claims of private citizens. This is an apparent anomaly given that courts generally accord less protection to the First Amendment rights of prisoners and public employees than those of private citizens.[8]

---

[7] The City argues that Markov is not liable under § 1983 for any violations of Doe's "Fourth, Fifth, Eight or Fourteenth Amendment rights . . .because [she] has not pleaded any factual allegations indicating . . . Markov's personal involvement in these alleged violations." City Mem. of Law 17. While I agree, I note that I do not view the complaint as raising any such claims and Doe does not argue to the contrary. *See* Pl.'s Resp. to City 14–15 (arguing only that there is a valid § 1983 claim against Markov because First Amendment retaliation claims "are actionable under section 1983"). I also note that this argument applies with equal force to the John Doe Officers, who are alleged only to have "pressured, bullied, threatened and intimidated" Doe at the hospital "in an attempt to prevent [her] from implicating NYPD police officers in the sexual assault upon her." Compl. ¶ 43.

[8] *See, e.g.*, *Burns v. Martuscello*, 890 F.3d 77, 86 (2d Cir. 2018) ("While an individual is not stripped of all constitutional rights upon incarceration, an inmate's constitutional liberties are necessarily limited. 'A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" (quoting *Shakur v. Selsky*, 391 F.3d 106, 113 (2d Cir. 2004)); *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 465 (1995) ("Congress may impose restraints on the job-related speech of public employees that would plainly be unconstitutional if applied to the public at large.").

Prisoners and public employees are required to "show that '(1) the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)) (prisoners); *accord, e.g., Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (public employees). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) (citations omitted), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Moreover, this "objective test applies even where a particular [prisoner] was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381; *accord Ford v. Palmer*, 539 F. App'x 5, 6 (2d Cir. 2013) (holding that prisoner who continued to file grievances nonetheless alleged an adverse action sufficient to sustain a First Amendment retaliation claim).

In cases involving criticism of public officials by private citizens, on the other hand, the Second Circuit had previously required a plaintiff to prove that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions *effectively chilled* the exercise of his First Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (emphasis added). This third element required a plaintiff to show that "his First Amendment rights were 'actually chilled.'" *Id.* (quoting *Davis v. Vill Park II Realty Co.*, 578 F.2d 461, 464 (2d Cir. 1978)). This is because "[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (alteration in original) (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). The Second Circuit reiterated this requirement for a

private citizen's First Amendment retaliation claim in *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010), a case relied upon by the City. *See* City Mem. of Law 23 (citing this case for the standard).

The Second Circuit has long noted the tension between its First Amendment retaliation cases, suggesting in one case that the requirement of a subjective chill it had imposed in some cases was perhaps a function of the injury-in-fact requirement for Article III standing. *See Gill*, 389 F.3d at 381–84 (rejecting the argument that prisoners must allege an actual chill). "Under this approach, standing is no issue whenever the plaintiff has clearly alleged a concrete harm independent of First Amendment chilling. It is only a problem where no harm independent of the First Amendment is alleged. For there, the only injury is the chilling itself." *Id.* at 383.

In *Dorsett*, a case dealing with criticism of public officials by a private citizen, the Second Circuit embraced this theory. 732 F.3d at 160. The court stated that although it had "sometimes given the impression that the silencing of the plaintiff's speech is the only injury sufficient to give a First Amendment plaintiff standing," its prior statements to that effect were "an imprecise statement of law." *Id.* Rather, "[c]hilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." *Id.* Thus, rather than requiring actual chilling, *Dorsett* requires only that a plaintiff show that "the defendant's action caused him *some injury*." *Id.* (emphasis added); *see also Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) ("Where chilling is not alleged, other forms of tangible harm will satisfy the injury requirement."). The Second Circuit subsequently reaffirmed this holding, relying on *Dorsett* in stating that a district court erred "as a matter of law" in requiring the plaintiff to prove that "defendants' action effectively chilled the exercise of his First Amendment right." *Mangino v. Incorporated Village of Patchogue*, 808 F.3d 951, 955–56 (2d Cir. 2015).

Here, the City's sole argument for why Doe's First Amendment retaliation claim fails is that her speech was not actually chilled. *See* City Mem. of Law 23–24. Specifically, it argues that "[b]ecause plaintiff *in fact* went through with bringing charges of rape against Defendants Hall and Martins . . . [her] 'speech' was not chilled." *Id.* at 24. In light of *Dorsett*, this argument fails. Instead, Doe need allege only: (1) the exercise of a First-Amendment-protected right, (2) that "the defendant's actions were motivated or substantially caused by [the] exercise of that right" and (3) that "the defendant's action caused [her] some injury" sufficient for standing. *Dorsett*, 732 F.3d at 160. As discussed below, plaintiff alleges facts that plausibly meet all three prongs.

*1. Doe had a First Amendment right to report her rape by Hall and Martins.*

There can be little doubt that reporting a rape by police officers is speech protected by the First Amendment. "The rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (citations omitted). Indeed, the Supreme Court has described the right "to petition for a redress of grievances [as] among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 222 (1967). And "[t]he reporting of a crime to police officers 'constitutes an exercise of the First Amendment right to petition the government for the redress of grievances.'" *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 550 (N.D. Ill. 2011) (citation omitted); *see also, e.g., Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) ("[I]t is well-established that 'retaliation against a prisoner for pursing a grievance violates the right to petition government for the redress of grievances.'" (citation omitted)); *Griffin v. City of New York*, 880 F. Supp. 2d 384, 394 (E.D.N.Y. 2012) ("[P]laintiff's complaint to IAB is protected under the First Amendment."). Therefore, Doe's statements to

"NYPD officers that she had been raped by two plainclothes police officers" and that "she wished to press charges," Compl. ¶¶ 41–42, were First-Amendment-protected speech.

### 2. Doe has plausibly alleged that Markov's actions were motivated or substantially caused by her complaint that she was raped by police officers.

Doe has also plausibly alleged that Markov's comments came in response to her attempt to report her rape by police officers. Doe alleges that after she told police officers that "she had been raped by two plainclothes police officers" and "wished to press charges," Compl. ¶¶ 41–42, Officer Markov "repeatedly stated to plaintiff and her mother that the two plainclothes police officers were not real police officers and that he was aware that [Doe had] made the same complaints previously about other police officers," *id.* ¶ 47. Markov "kept repeating" to Doe and her mother that she had "the story wrong," that she "was not raped by police officers," and that she "did not know what she was talking about." *Id.* ¶¶ 48–49.[9] He was speaking to plaintiff and her mother in Russian, "in a private room away from the other officers." *Id.* ¶ 46. As a result, Doe felt "pressured and intimidated." *Id.* And Doe was not alone in perceiving Markov's behavior as being threatening or as intended to prevent her from reporting her sexual assault: a nurse standing "nearby urged plaintiff's mother to 'be strong' and stand up for her daughter" in the face of Markov's intimidation tactics. *Id.* ¶ 51. It can be reasonably inferred from Markov's conduct that he was trying to prevent Doe from submitting to a medical exam and from pressing charges against his fellow officers. *Id.* ¶ 50. As I must draw all reasonable inferences in

---

[9] While the complaint does not make clear whether Doe is alleging that Markov was casting doubt on whether she had been raped or only on her assertion that her assailants were police officers, Doe's testimony at the 50-h hearing indicates that Markov suggested that she was lying about both. She testified that Markov told her "you are not crying right now. You don't look like you just got raped, and he was smirking at me and kind of like laughing, trying to make me believe like they were not real cops." 50-h hr'g tr. 633, ECF No. 52; *see also id.* at 637. In any event, as I am required to resolve all ambiguities in Doe's favor on a motion to dismiss, I interpret the complaint as alleging that Markov claimed both that she was not raped and that her assailants were not police officers.

favor of the plaintiff on a motion to dismiss, she has plausibly alleged that Markov's actions were "motivated or substantially caused" by her First-Amendment-protected speech.

### 3. *Doe has plausibly alleged that she has suffered some injury.*

The final prong of *Dorsett* is the requirement of "some injury." The examples that *Dorsett* gives of an injury sufficient to state a claim are largely of economic harms, although one is intangible—"additional scrutiny at a border crossing." 732 F.3d at 160. Here, however, the only injury that Doe alleges she incurred is "severe and extreme emotional distress." Compl. ¶ 90. Specifically, Doe alleges that she suffered from "fright, anguish, shock, nervousness, and anxiety." *Id.* ¶ 91. It is an unsettled question in this circuit whether such emotional damages are sufficient, standing alone, to give rise to a First Amendment retaliation claim.

The Second Circuit explicitly left open the question of whether "allegations of emotional and psychological harm establish compensable injury in a First Amendment retaliation claim." *Zherka*, 634 F.3d at 646–47 & n.9. Other circuits, however, have "recognize[d] that in some [First Amendment retaliation] cases 'injury based on embarrassment, humiliation, and emotional distress' is sufficient to be actionable under § 1983." *Mattox v. City of Forest Park*, 183 F.3d 515, 521 (6th Cir. 1999) (quoting *Bloch v. Ribar*, 156 F.3d 673, 679–80 (6th Cir. 1998)); *see also Novoselsky v. Brown*, 822 F.3d 342, 356 (7th Cir. 2016) ("In certain cases, a public official may also face liability where he retaliated by subjecting an individual to 'embarrassment, humiliation, and emotional distress.'"); *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002) ("In some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim."). I concur with this conclusion for the following reasons.

*Dorsett* implicitly characterizes the requirement that a plaintiff show "some injury" as stemming from the requirements for Article III standing. 732 F.3d at 160. Immediately after

stating that "[c]hilled speech is not the *sine qua non* of a First Amendment claim," the court

notes: "A plaintiff has standing if he can show *either* that his speech has been adversely affected

by the government retaliation or that he has suffered some other concrete harm." *Id.* This is

consistent with the Second Circuit's observation in *Zherka* that "[w]here chilling is not alleged,

other forms of tangible harm will satisfy the injury requirement, since 'standing is no issue

whenever the plaintiff has clearly alleged a *concrete* harm independent of First Amendment

chilling.'" 634 F.3d at 646 (quoting *Gill*, 389 F.3d at 383). Such language suggests that the

Second Circuit now requires private citizens raising First Amendment claims to show only a

concrete harm sufficient to constitute an "injury in fact" sufficient for standing.[10]

      Emotional distress of the type alleged by Doe is a concrete harm sufficient to meet the

injury-in-fact requirement for Article III standing. "To establish injury in fact, a plaintiff must

show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and

particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robbins*,

---

[10] *Zherka* contains language that can be read as imposing a higher standard for establishing "concrete harm" in First Amendment retaliation cases than the injury in fact required for standing. Before stating that "other forms of tangible harm will satisfy the injury requirement," the court stated that "[h]urt feelings or a bruised ego are not by themselves the stuff of constitutional tort." 634 F.3d at 645–46. The court later continued, "the presumed damages of defamation *per se* under New York law [, which does not require a showing of actual damages,] do not establish a concrete harm sufficient for a federal claim of First Amendment retaliation." *Id.* at 646. *Zherka* also restated the question presented in that case as whether "the injury presumed by state law to arise from mere utterance of words [is] solid enough ground on which to state a federal constitutional tort claim?" *Id.*

Notwithstanding these statements, however, the core of the court's analysis focuses on the fact that New York law *presumes* damages from the mere utterance of certain types of words, and that such "*per se* defamation was the only harm alleged" in that case. *Id.* at 646–47. The actual holding of *Zherka* thus appears to be relatively narrow: where there are no actual damages alleged—only presumed damages—there is no concrete harm. *See id.* at 646 ("Our holding today does not rule out the use of non-*per se* claims of defamation in § 1983 First Amendment retaliation claims. Where concrete harm is alleged and specified, the claim may proceed."). This narrow holding is consistent with *Dorsett*'s equation of the "concrete harm" required to bring a First Amendment retaliation claim with the "concrete harm" required for Article III standing.

136 S. Ct. 1540, 1548 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). But while such an injury must be "concrete," it need not be "tangible." *Id.* at 1549. "In determining whether an intangible harm constitutes injury in fact . . . . , it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* (citations omitted). Emotional distress meets this test—it is the harm underlying the common-law tort of intentional infliction of emotional distress. Indeed, it is well-established that "compensatory damages may include . . . personal humiliation, and mental anguish and suffering." *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (citations omitted)). Further, other federal courts to treat the issue since *Spokeo* have affirmed "that emotional harm satisfies the 'injury in fact' requirement of constitutional standing." *Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 169 (5th Cir. 2016); *accord Ben-Davis v. Blibaum & Assocs., P.A.*, 695 F. App'x 674, 676–77 (4th Cir. 2017); *Moore v. Blibaum & Assocs., P.A.*, 693 F. App'x 205, 206 (4th Cir. 2017); *In re Big Apple Volkswagen, LLC*, 571 B.R. 43, 50 (S.D.N.Y. 2017).

Accordingly, at least at the pleading stage, I conclude that the "severe and extreme emotional distress" alleged by Doe, Compl. ¶ 90, is sufficient to plausibly allege a claim of First Amendment retaliation. Because such emotional distress amounts to a concrete harm sufficient for Article III standing, it is also sufficient to meet *Dorsett*'s requirement of "some injury."

Additional precedent supports this conclusion. The Second Circuit has already found that a claim of emotional distress can serve as a sufficient basis to bring a First Amendment retaliation suit. *See Bernheim v. Litt*, 79 F.3d 318, 325–26 (2d Cir. 1996). In *Bernheim*, the plaintiff (a public employee) spoke out about purported misrepresentations by her employer. *Id.* at 325. The defendant argued that the plaintiff "fail[ed] to allege any legally cognizable harm" because

she was not fired. *Id.* But the court of appeals held that the plaintiff had sufficiently alleged a cognizable injury on two independent grounds. First, it was sufficient that she "allege[d] that her reputation, opportunities for advancement and earning potential have been impaired by the acts of the defendant." *Id.* More importantly for this case, the court also found that the plaintiff had alleged a second, legally cognizable harm: that she "ha[d] endured a campaign of harassment, 'which caused her great worry and unhappiness.'" *Id.* (quoting the complaint). The court stated, "It is a basic principle of tort law in general, and of civil rights law in particular, that compensable injury may include . . . injuries such as 'personal humiliation' and 'mental anguish.' The plaintiff's claim . . . could reasonably be read as a claim for emotional distress, a legally recognized and compensable harm." *Id.* at 325–26 (citation omitted). Thus, the complaint "stated a legally cognizable claim under Section 1983 and the First Amendment." *Id.* at 326.[11]

Moreover, the damages suffered by Doe rise far above the bare minimum required for constitutional standing. Unlike the purely "presumed injury" that was held insufficient to state a First Amendment retaliation claim in *Zherka*, 634 F.3d at 646, this is a case where the "mere utterance of words" did inflict a concrete harm. Doe was aggressively questioned and intimidated by a man with a badge and a gun mere hours after two detectives allegedly raped her in the back of a police van. It would undoubtedly be distressing for any survivor of rape to be accused by a police officer of lying or of having made prior false complaints mere hours after the sexual assault; it can only be more upsetting if these accusations are made with the apparent motive of preventing the victim from lodging a complaint against the harasser's fellow officers.

---

[11] Notably, the Supreme Court has also found that emotional distress is a legally cognizable injury that can support a § 1983 suit. *See Carey v. Piphus*, 435 U.S. 247, 264 (1978) ("[M]ental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983.").

Indeed, Doe plausibly alleges the kind of "adverse action" that public employees and prisoners are required to show—"retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dawes*, 239 F.3d at 493. This inquiry "is 'not static across contexts,' but rather must be 'tailored to the different circumstances in which retaliation claims arise.'" *Id.* (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)). Thus, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.* (second alteration in original) (quoting *Thaddeus-X*, 175 F.3d at 398). Drawing all reasonable inferences in plaintiff's favor, it is plausible that an average citizen of ordinary firmness who had been raped hours earlier by two on-duty police officers would be deterred from pursuing a complaint by a responding officer accusing her of lying and intimidating her in an apparent attempt to prevent her from filing charges, thereby giving her reason to doubt whether her complaint would be given any credence.

### B. Doe has not stated a plausible claim against the John Doe Officers or the City.

Nonetheless, although I will not dismiss Doe's First Amendment retaliation claim against Markov, I will dismiss her First Amendment claims against the John Doe Officers and the City.

The only factual allegation pleaded against the John Doe Officers is that they "pressured, bullied, threatened and intimidated" Doe "in an attempt to prevent [her] from implicating NYPD police officers in the sexual assault upon her." Compl. ¶ 43; *see also id.* ¶ 52. While this is the same allegation that she makes against Markov, the complaint does not detail any particular actions taken or comments made by the John Doe Officers. Without further factual support, this is the type of conclusory assertion that I am "not bound to accept as true" and that "do[es] not suffice" to state a claim for relief. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Similarly, the only factual allegation against the City is that the officers' "threats and intimidation were part of a widespread pattern or practice engaged in by NYPD officers to prevent victims of such sexual assaults from reporting [these assaults] to the authorities." Compl. ¶ 53. But, as discussed above, the City cannot be sued on a *respondeat superior* theory for constitutional torts and this conclusory allegation is insufficient to state a *Monell* claim.

## CONCLUSION

For the foregoing reasons, the defendants' motions to dismiss are granted in part and denied in part. Specifically, the *respondeat superior* claim against the City for false arrest and imprisonment, the claim against Officer Markov for First Amendment retaliation, and the claims against Detectives Hall and Martins survive; all other claims are dismissed. The *respondeat superior* claim for sexual assault against the City, the *Monell* claim against the City, the intentional infliction of emotional distress claim, and the First Amendment retaliation claim against the City and the John Doe officers are dismissed with prejudice because these claims fail as a matter of law. *See Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile."). The negligence claims against the City and Espey, as well as the § 1983 claim against Espey,[12] are dismissed without prejudice because I cannot yet say that permitting further amendment would be futile. If the plaintiff later learns of facts that would plausibly support such claims, she may move to amend her complaint.

---

[12] As discussed above, Doe cannot plausibly allege a false arrest claim under § 1983. *See* Point I, *supra* (citing *Townes*, 176 F.3d at 145). Thus, even Espey's personal involvement in plaintiff's arrest would not state a constitutional claim. Her allegation of sexual assault, however, raises a colorable claim of a constitutional violation under the Fourth or the Fourteenth Amendment. And the Second Circuit has made clear, in the prison context, that even a single instance of severe sexual abuse can constitute cruel and unusual punishment. *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015).

```
_____/s/_____
Allyne R. Ross
United States District Judge
```

Dated:      August 9, 2018
             Brooklyn, New York