UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Anna Doe,<br><br>    Plaintiff,<br><br>— against —<br><br>The City of New York, Detective Richard Hall, Detective Eddie Martins, and Police Officer Gregory Markov,<br><br>    Defendants. | **18-cv-670 (ARR) (JO)**<br><br><br><br><br><br>**Opinion & Order** |

ROSS, United States District Judge:

The plaintiff, Anna Doe, alleges that New York City Police Department Detectives Richard Hall and Eddie Martins stopped her in a public park, took her into custody, repeatedly raped her in the back of their police van, and released her without charging her with any crime. She sought treatment that night at Maimonides Hospital. Officer Gregory Markov—along with a number of additional, unnamed police officers—met her there, purportedly to investigate her rape allegation. Instead, Doe contends, they mocked and bullied her in an attempt to prevent her from filing a complaint against their fellow police officers.

Doe filed suit in Kings County Supreme Court against Hall, Martins, Markov, and the City of New York, along with Hall and Martins' supervisor, Sergeant John Espey, and the unnamed police officers who met Doe at the hospital. The City removed the complaint to federal court. In August 2018, I dismissed the claims against Espey and the unnamed police officers, as well as several claims against the City. Remaining are Doe's claim against Markov for First Amendment retaliation, her *respondeat superior* claim against the City for false arrest and imprisonment, and all of her claims against Hall and Martins. Markov and the City have moved for summary judgment; Hall and Martins do not join their motion. Doe opposes. For the reasons set forth below,

the defendants' motion for summary judgment is denied.

**BACKGROUND**

### I. The Stop, Arrest, and Alleged Rape of Anna Doe

On September 15, 2017 at around 7:30 or 8:00 p.m., plaintiff Anna Doe drove with two friends, Mitchell and David ("Snoopy"), to Calvert Vaux Park in Brooklyn (the "Park"). Defs.' Rule 56.1 Statement ¶¶ 1–2, ECF No. 100 ("Defs.' 56.1"); Pl.'s Resp. to Defs.' 56.1 at ¶¶ 1–2, ECF No. 103; Pl.'s 56.1 Counter-Statement ¶ 3, ECF No. 103; Defs.' Resp. to Pl.'s 56.1 Counter-Statement ¶ 3, ECF No. 106. They took Snoopy's car, with Doe driving. Defs.' 56.1 at ¶ 1; Pl.'s Resp. to Defs.' 56.1 at ¶ 1. The three friends soon arrived at the Park's parking lot, where they stopped and Mitch prepared two marijuana cigarettes. Defs.' 56.1 at ¶ 13; Pl.'s Resp. to Defs.' 56.1 at ¶ 13.[1] According to Doe, the two cigarettes ended up in the cup holder by the front seats, along with a clear bag containing some loose marijuana. *See* Doe 50-h Tr. Defs.' Ex. B at 389:4–390:3, ECF No. 101-2. At the same time, New York City Police Department ("NYPD") Detectives Hall and Martins sat in their unmarked Dodge Caravan in the parking lot. Defs.' 56.1 at ¶¶ 5–6; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 5–6.

Doe noticed a dirt road inside the Park and saw that the gate at its entrance was open. Defs.' 56.1 at ¶ 14; Pl.'s Resp. to Defs.' 56.1 at ¶ 14. By this time, it was dark outside, and the dirt road wound through a wooded area with no artificial lighting. *See* Defs.' 56.1 at ¶¶ 18–19; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 18–19; Pl.'s 56.1 Counter-Statement ¶ 4; Defs.' Resp. to Pl.'s 56.1 Counter-

---

[1] The Rule 56.1 Statements differ from some of Doe's testimony. At her deposition, Doe testified that she did not stop the car anywhere before Hall and Martins stopped her, Doe Dep. Defs.' Ex. C at 44:17–19, ECF No. 101-3, but her counsel nonetheless marked as undisputed the defendants' assertion that she stopped in the parking lot while Mitch prepared the marijuana cigarettes, Defs.' 56.1 at ¶ 13; Pl.'s Resp. to Defs.' 56.1 at ¶ 13. Where, as here, any discrepancies are not material to my analysis, I accept as undisputed the facts that counsel have marked as such in their Rule 56.1 Statements.

Statement ¶ 4. Doe drove onto the dirt road toward a dark, unpaved lot, which contained some shipping containers but was otherwise empty. Defs.' 56.1 at ¶¶ 17, 19, 21; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 17, 19, 21. Sometimes, people would park their cars in this lot during sporting events in the nearby fields; however, on this night, no one was playing sports in the fields. Defs.' 56.1 at ¶ 20; Pl.'s Resp. to Defs.' 56.1 at ¶ 20. Hall and Martins followed Doe onto the dirt road. Defs.' 56.1 at ¶ 26; Pl.'s Resp. to Defs.' 56.1 at ¶ 26.

Hall and Martins then turned on their van's police lights and pulled over Doe and her passengers. Defs.' 56.1 at ¶ 30; Pl.'s Resp. to Defs.' 56.1 at ¶ 30. The detectives exited their van and walked to Snoopy's car, with Hall approaching Doe on the driver side and Martins approaching the passenger side. Defs.' 56.1 at ¶ 33; Pl.'s Resp. to Defs.' 56.1 at ¶ 33; *see* Martins Dep. Defs.' Ex. G at 190:9–191:18, ECF No. 101-7. Hall asked Doe why she was "back there" on the dirt road and said, in sum and substance, "[y]ou know you guys aren't supposed to be here, right?" Defs.' 56.1 at ¶ 34; Pl.'s Resp. to Defs.' 56.1 at ¶ 34. He told Doe that she and her passengers could not be in that area of the Park because it was after dark. Defs.' 56.1 at ¶ 35; Pl.'s Resp. to Defs.' 56.1 at ¶ 35. Hall and Martins instructed Doe and her passengers to exit the car and frisked them. Defs.' 56.1 at ¶¶ 41–42; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 41–42. Martins also searched Doe's handbag, where he found half an ounce of marijuana, two Klonopin pills, and a filled water bong. Defs.' 56.1 at ¶¶ 43–45; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 43–45. Doe also had a bag in her bra containing twenty dollars' worth of cocaine. Defs.' 56.1 at ¶ 37; Pl.'s Resp. to Defs.' 56.1 at ¶ 37. Martins handcuffed Doe and led her into the back of the police van. Defs.' 56.1 at ¶ 46; Pl.'s Resp. to Defs.' 56.1 at ¶ 46.

Doe alleges that Hall and Martins drove her to the parking lot of a Chipotle restaurant in Brooklyn, where they raped her. Third Am. Compl. ¶ 14, ECF No. 42. They then proceeded to

drive around Brooklyn, repeatedly raping her along the way until they released her near the NYPD's 60th precinct without charging her with any crime. *Id.* ¶¶ 15–17.

Several disputes of fact surround the detectives' stop of Doe and her passengers. The defendants assert that the detectives stopped Doe for at least one of three reasons: because they believed Snoopy's car had excessively tinted windows, because they believed Doe and her passengers' presence in the Park violated the City's park rules, or because they believed Doe and her passengers possessed or consumed illegal drugs. I will discuss the facts surrounding each of these purported bases for the stop in turn.

A. Tinted Windows

The parties dispute whether Snoopy's car had tinted windows. Hall testified that Snoopy's car had windows tinted in excess of the level that governing ordinances permitted. *See* Hall Dep. Pl.'s Ex. E at 157:3–5, 164:15–18, ECF No. 104-5. He saw the tinted windows before pulling over Doe, while the police van was still moving. *See* Hall Dep. Volume II Defs.' Ex. I at 236:5–13, ECF No. 101-9. Hall testified that New York State law requires a car's windows to allow seventy percent of light to pass through. *Id.* 235:10–12. Based on his experience, when he cannot "see clearly into the car" through the windows, "then the windows are tinted beyond the regulation." *Id.* 235:18–20. Martins, however, could not remember at his deposition whether Snoopy's car had tinted windows. *See* Martins Dep. Pl.'s Ex. D at 121:9–11, ECF No. 104-4. He further testified that he did not think that he was able to observe whether Snoopy's car had tinted windows, or that he did not think that Snoopy's car had tinted windows; his phrasing is unclear. *See id.* 198:6–9. Doe testified that Snoopy's car did not have tinted windows and that Hall and Martins' police van did have tinted windows. *See* Doe Dep. Defs.' Ex. C at 57:11–15, ECF No. 101-3.

B. Park Rules

The defendants assert that Doe and her friends violated park rules by occupying the Park because the Park—or at least the area beyond the gate at the entrance to the dirt road—was closed. Under New York City Rules, "[p]ersons may enter and use the parks from 6:00 a.m. until 1:00 a.m. unless other open hours are posted at any park[,]" and "[n]o person shall enter or remain in any park without the permission of the Commissioner when such park is closed to the public." Rules of City of New York Department of Parks and Recreation (56 RCNY) § 1-03(a)(1), (3).

The parties dispute whether the Park contained any signs indicating that the Park was closed at or around 8:00 p.m. Doe testified that the Park did not close at dark. Doe 50-h Tr. Defs.' Ex. B at 187:15–17. Martins testified that "there should be signs in the entrance of the park" stating the hours of operation but that he did not recall whether he saw any such signs. Martins Dep. Pl.'s Ex. D at 26:9–18. He also testified that he believed the dirt road in particular contained a "no trespass" sign. Martins Dep. Defs.' Ex. G at 185:18–21. Hall testified that he thought a sign marked the dirt road as a prohibited area but could not recall what the sign said verbatim. Hall Dep. Pl.'s Ex. E at 174:13–19. Markov testified that he had visited the Park at night, that it is open at night— including at 8:00 p.m. in particular—and that he had not noticed any signs in the Park at all. Markov Dep. Pl.'s Ex. F at 153:8–23, ECF No. 104-6. Frank Abbriano, a Lieutenant in Markov's precinct, testified that he was familiar with the Park and that while he believed it closed at night, he had never seen any signs indicating as much. *See* Abbriano Dep. Pl.'s Ex. H at 9:3–10, 59:25– 60:9, 60:22–61:9, ECF No. 104-8. Espey testified that he had patrolled the Park at night, that he had always encountered people in the Park at night, and that the Park had always been open when he visited at night; he testified that while the specific times of night at which he patrolled the Park varied, he could have patrolled it—and found it open—after 8:00 p.m. Espey Dep. Pl.'s Ex. G at 31:2–24, ECF No. 104-7.

The testimony also reveals disputes as to whether a gate or barrier typically blocks access to the dirt road at night. Doe testified that on the night of September 15, 2017, the gate leading to the dirt road was open, but that usually it was not open and the dirt road was closed to the public at night. Doe 50-h Tr. Defs.' Ex. B at 185:14–17, 187:6–14. She further testified that she remembered telling Snoopy that the detectives were going to stop them because they were driving on the dirt road, and "[p]eople don't really go back there." *Id.* 395:9–13. However, she also testified that on that September 15, she did not know that driving onto the dirt road was prohibited, and she thought that she could "be in every part" of the Park. *Id.* 207:17–25. She also testified that when the detectives pulled her over, she told one of them that she did not know that being on the dirt road was prohibited. *Id.* 398:25–399:2, 18–19. Hall testified that when he saw Doe's car, it had passed an open barrier; that the barrier was already open before Doe encountered it; and that he had seen the barrier open on prior occasions. Hall Dep. Pl.'s Ex. E at 173:23–174:12. However, he also described Doe's route as heading into a "restricted area." Hall Dep. Volume II Defs.' Ex. I at 218:7–8. Markov testified that when he had visited the Park at night in the dark, he had not encountered any physical barriers that would block someone from driving onto the dirt road. Markov Dep. Pl.'s Ex. F at 154:16–155:6. Espey testified that whenever he had visited the entrance that leads to fields in the back of the Park—which might describe the dirt road where the detectives stopped Doe, though the description in Espey's testimony is unclear—he had found it open, including at night. Espey Dep. Pl.'s Ex. G at 34:22–35:5, 36:10–13.

C. Possession or Consumption of Illegal Drugs

It is undisputed that Hall and Martins knew the Park as a "drug prone location." Defs.' 56.1 at ¶ 9; Pl.'s Resp. to Defs.' 56.1 at ¶ 9. It is also undisputed that before September 15, 2017, Hall and Martins had seen people use drugs in the Park and Doe had smoked marijuana in the Park.

Defs.' 56.1 at ¶¶ 10–12; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 10–12. In Martins' experience, the unpaved lot at the end of the dirt road saw even higher levels of drug consumption than did other areas of the Park. Defs.' 56.1 at ¶ 25; Pl.'s Resp. to Defs.' 56.1 at ¶ 25. Martins testified that in his career, he had made more than thirty narcotics-related arrests in the Park. Martins Dep. Defs.' Ex. G at 195:3–12. Hall testified that in 2017, he made approximately fifteen drug-related arrests in the Park. Hall Dep. Volume II Defs.' Ex. I at 231:2–15. Hall further testified that earlier in the night on September 15, 2017, he and Martins stopped another vehicle in the Park because they smelled marijuana emanating from it, but they did not issue any summonses or arrest anyone because they could not find any marijuana in the car. *Id.* 214:11–215:12, 216:3–9.

## II.    Maimonides Hospital

After the alleged rapes, and between 10:00 p.m. on September 15 and 12:00 a.m. on September 16, 2017, Doe sought treatment at the Maimonides Hospital emergency room, where her mother accompanied her. Defs.' 56.1 at ¶ 47; Pl.'s Resp. to Defs.' 56.1 at ¶ 47. Doe reported to hospital staff that two police officers had raped her and allowed a nurse to call the police. Defs.' 56.1 at ¶¶ 48–49; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 48–49. Markov, working for the 60th precinct on that night, arrived at the hospital with his partner to investigate Doe's rape allegation. Defs.' 56.1 at ¶¶ 50–53; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 50–53. Markov questioned Doe for about fifteen minutes, during which time he began to write notes and draft a complaint based on her rape allegations. Defs.' 56.1 at ¶¶ 52, 57; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 52, 57. As part of this questioning, Markov asked Doe how she knew that the men who raped her—who, the parties agree, wore plainclothes—were police officers. Defs.' 56.1 at ¶ 54; Pl.'s Resp. to Defs.' 56.1 at ¶ 54.

According to Markov, when he questioned Doe, he was trying to determine whether her

alleged rapists were, in fact, police officers. *See* Markov Dep. Defs.' Ex. F at 198:9–13, ECF No. 101-6. He questioned Doe about the identities of the alleged rapists because she did not name the detectives or say that she knew them personally. *See id.* 199:25–200:3. He also told Doe that it was possible that the men who raped her were "chase truck drivers" or "bounty hunters"—men "who . . . sometimes look and dress like [police officers] . . . in plain clothes." Markov Dep. Pl.'s Ex. F at 88:18–22, 105:10–15. Markov testified that in prior cases, when other victims did not know their assailants, he had an "investigative duty to ask questions to ascertain the identit[ies] of those perpetrators." Markov Dep. Defs.' Ex. F at 202:10–19.

Doe, however, testified to additional facts that paint quite a different picture of Markov's conduct. Markov's behavior "made [Doe] feel very uncomfortable," Doe 50-h Tr. Defs.' Ex. B at 633:21–22; Doe Dep. Pl.'s Ex. C at 101:25–102:1, ECF No. 104-3, and she described it as "harass[ment]," Doe Dep. Pl.'s Ex. C at 100:23–25. She testified that Markov said "you are not crying right now" and "[y]ou don't look like you just got raped[.]" Doe 50-h Tr. Defs.' Ex. B at 633:10–14. Doe testified that, in fact, she "cried a lot." Doe Dep. Pl.'s Ex. C at 106:6–10. She further testified that Markov "was smirking at [her] and kind of . . . laughing, trying to make [her] believe like [her alleged rapists] were not real cops . . . ." Doe 50-h Tr. Defs.' Ex. B at 633:14–16. She described Markov as "trying to take away [her] credibility." Doe Dep. Pl.'s Ex. C at 101:10–11.

During her interaction with Markov, there were at least four, and possibly as many as eight or more, other male police officers in the room. *See* Doe 50-h Tr. Defs.' Ex. B at 629:20–24; Doe Dep. Pl.'s Ex. C at 98:1–2, 98:22–24. Markov laughed at her in front of these other officers. Doe Dep. Pl.'s Ex. C at 102:23–25, 103:24–104:2. Doe described the police officers in the room as "snotty" and "giggling," speaking to her in a way that indicated they "didn't believe . . . what [she]

was saying." *Id.* 106:25–107:3.

In addition, Doe testified that Markov asked her, an estimated four times, "don't [you] have a situation like this already[?]" *Id.* 116:13–14. He also asked her mother "is this the first time your daughter is having a situation like this[?]" *Id.* 101:5–7. Doe testified that she had not "had a similar situation previously" and did not "even know what they [were] talking about." *Id.* 116:15–18. Markov denied making these comments. Markov Dep. Pl.'s Ex. F at 108:8–19; 123:12–21. Doe also testified that Markov spoke to her in Russian. Doe Dep. Pl.'s Ex. C at 116:22.

Two points of Doe's testimony about Markov's conduct are somewhat contradictory, though I can draw consistent inferences from her explanations. First, Doe testified that nobody from Markov's precinct threatened or intimidated her. *Id.* 100:15–17. However, when later asked what the officers at the hospital did "to threaten and intimidate" her, she responded that their "questions" were not "proportioned" and then described some of Markov's aforementioned behavior. *Id.* 115:24–116:14. Doe thereby implied that Markov's behavior did threaten and intimidate her. Second, Doe initially testified at her deposition that Markov told her and her mother not to file a complaint against Hall and Martins. *See id.* 99:9–13. She elaborated that he did so by saying "[a]re you sure you should be going through with this[?] Are you sure they were police officers[?] How are you so sure[?]." *Id.* 99:14–17. However, when subsequently asked whether she ever told the Brooklyn District Attorney's office that no one from Markov's precinct told her not to file a complaint, she responded "[m]aybe. Because maybe they didn't tell me [not to] file a complaint but they did tell me why [are you] going through with this[?] Are you doing this[?] They did tell me . . . basically not to do that." *Id.* 99:24–100:14. Based on this testimony, even if I assume that Markov did not tell Doe outright not to file a complaint, I can infer that he implied as much.

Doe testified about the emotional injuries that she suffered as a result of the events of that

night. Some of Doe's testimony does not directly implicate Markov as a cause of her injuries. Doe identified "[t]he rape" as the cause of her emotional injuries as opposed to Hall and Martins' stop of her car. Doe Dep. Defs.' Ex. C at 132:1–5. Doe also testified that she "[did not] know which" of her emotional injuries Markov caused at the hospital. *Id.* 132:6–8. In addition, she testified that even if Markov had not behaved in the way that she testified he did, she thought she would have nonetheless suffered the emotional injuries that the rape caused. *See id.* 132:12–15. She also stated that her lawsuit "[is] not really about Markov," although an attorney interrupted her before she could explain this comment. *Id.* 169:25–170:4. However, Doe also testified about the "mental[]" damages that she suffered "as a result of *this incident*," without explaining whether the term "incident" refers to the rape, her interaction with Markov at the hospital, or both. Doe Dep. Pl.'s Ex. C at 123:6, 9; 126:25–127:2, 127:24–128:13 (emphasis added). She testified that she "lost interest in a lot of things [she] used to be interested in." *Id.* 127:4–5. She also testified that she "lost a lot of people around [her]" and that she does not "want to be around people anymore." *Id.* 128:15–16. She does not "trust people." *Id.* 128:16. She visited a therapist or counselor after "this incident," whereas she had not ever visited a therapist or counselor before. *Id.* 123:6–11.

Further, Doe testified that she has become afraid. She is "scared of being around police officers now." *Id.* 127:5–6. She further explained that she is "fearful nowadays of things that [she] would never have cared to look twice upon. [Her] mindset has changed about the way [she] look[s] at certain things and the places [she is] in, certain situations with people [she is] with. Everything is just different." *Id.* 128:2–6.

## DISCUSSION

Following the events of September 15, 2017, Doe filed suit against Hall, Martins, Markov, Espey, the unnamed police officers from the hospital, and the City of New York. I previously

dismissed the claims against Espey and the unnamed police officers, as well as some of the claims against the City. Relevant to the instant motion for summary judgment are the remaining First Amendment retaliation claim against Markov and *respondeat superior* claim against the City for false arrest and imprisonment.

Doe argues that Markov's conduct at the hospital constituted retaliation for the exercise of her First Amendment rights. She also argues that the City is liable on a *respondeat superior* theory for common law false arrest and imprisonment arising from her confinement in Hall and Martins' custody after they stopped her in the Park. Defendants Markov and the City move for summary judgment on both of these claims.

## I. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues but rather to determine whether there is a genuine issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A dispute of fact is material if it "matters, i.e., [if] it concerns facts that can affect the outcome under the applicable substantive law." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)).

In assessing whether summary judgment is appropriate, I consider "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (quoting *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 99 (2d Cir. 2003)); *see Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (citing *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir. 1994)). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997).

## II.   Factual issues preclude summary judgment on Doe's First Amendment retaliation claim against Markov.

To prove First Amendment retaliation, "a plaintiff must show: (1) [s]he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [her] exercise of that right; and (3) the defendant's actions caused [her] some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). The defendants do not dispute the first element—that Doe had a First Amendment right; thus, I do not analyze that element here and instead briefly note that Doe had First Amendment rights to file a complaint against police officers and to free speech in general.[2]

The defendants first argue that Doe cannot prove the second element of the First Amendment retaliation claim because it is undisputed that Markov acted from a proper motive— to investigate Doe's rape allegations—and not from a motive to suppress her First Amendment

---

[2] I discuss these rights more fully below in the context of qualified immunity in Discussion section II.C.i.

rights. Next, the defendants make several arguments pertinent to the third element of the First Amendment retaliation claim regarding whether Markov's actions caused Doe some injury. First, the defendants argue that Markov did not chill Doe's speech. Second, the defendants argue that emotional damages cannot satisfy the injury element of the First Amendment retaliation claim. Third, the defendants argue that even if emotional damages could satisfy the injury element, Doe's emotional damages in this case are insufficient. Finally, the defendants argue that Markov is entitled to qualified immunity. I address each of these arguments in turn.

A. Whether Markov acted from a retaliatory motive is a genuine issue of material fact.

The second element of the First Amendment retaliation claim requires that Doe show that "the defendant's actions were motivated or substantially caused by [her] exercise of [a First Amendment] right[.]" *Dorsett*, 732 F.3d at 160. "Specific proof of improper motivation is required in order for [a] plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley*, 268 F.3d at 73 (citing *Blue v. Koren*, 72 F.3d 1075, 1082–83 (2d Cir. 1995)). This proof of improper motivation may take the form of direct evidence; however, "where . . . circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required." *Bennett v. Goord*, 343 F.3d 133, 138–39 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677, 683 (2d Cir. 2002)). "Evidence of improper motive 'may include expressions by the officials [involved] regarding their state of mind, circumstances suggesting in substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.'" *Anderson v. City of New York*, 817 F. Supp. 2d 77, 96 (E.D.N.Y. 2011) (quoting *Blue*, 72 F.3d at 1084).

The defendants argue that Markov acted from a motive to investigate Doe's rape allegation and not to retaliate against her for exercising a First Amendment right. *See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. 7–8, ECF No. 99 ("Defs.' Br."). Few undisputed facts could support

this assertion. It is undisputed that Markov received an assignment to investigate Doe's rape allegation. *See* Defs.' 56.1 at ¶ 50; Pl.'s Resp. to Defs.' 56.1 at ¶ 50. It is also undisputed that as Markov questioned Doe, he began to write a complaint based on her allegations. *See* Defs.' 56.1 at ¶¶ 52, 57; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 52, 57. Further, it is undisputed that Markov asked Doe how she knew that her alleged rapists were police officers. Defs.' 56.1 at ¶ 54; Pl.'s Resp. to Defs.' 56.1 at ¶ 54. These undisputed facts could support the inference that Markov acted from a motive to investigate Doe's rape allegation and nothing more, but they are not sufficient to establish on summary judgment that Markov acted from a proper motive. A reasonable jury could find that Markov had no intention to take Doe's complaint seriously, or that he asked Doe how she knew that her alleged rapists were police officers to bully her.

Beyond the parties' Rule 56.1 Statements of undisputed facts, Markov's deposition testimony sets forth some facts that, in isolation, suggest a benign motive. According to Markov, when he questioned Doe, he was trying to determine whether her alleged rapists were, in fact, police officers because she did not name the detectives or indicate that she knew them personally. *See* Markov Dep. Defs.' Ex. F at 198:9–13, 199:25–200:3. He also tried to determine whether the rapists could have been "chase truck drivers" or "bounty hunters," as men of these professions sometimes resemble plainclothes police officers. Markov Dep. Pl.'s Ex. F at 88:18–22, 105:10–15. In prior cases, when other victims did not know their assailants, Markov had an investigative duty to ascertain those assailants' identities. *See* Markov Dep. Defs.' Ex. F at 202:10–19. Markov further testified that based on the fact that he filled out "paperwork" while he questioned Doe, he could not have been "trying to suppress her First Amendment rights to make a report against police officers." Markov Dep. Pl.'s Ex. F at 108:24–109:6.

However, Doe's testimony adds numerous facts to Markov's narrative, and a reasonable

jury could find that these facts amount to "sufficiently compelling" circumstantial evidence that Markov acted from a motive to prevent Doe from reporting his fellow police officers for rape. *Bennett*, 343 F.3d at 139. Doe's testimony portrays Markov as treating her with such disrespect— and as behaving in a manner so inappropriate for a police officer responding to a rape—as to undermine any argument that he simply sought to investigate her rape in earnest. For example, Doe testified that even though she cried, Markov told her that she was not crying and that she did not look like she had been raped; that Markov smirked and laughed at her; that he tried to make her believe that her rapists were not real police officers; and that he tried to undermine her credibility. *See* Doe Dep. Pl.'s Ex. C at 101:10–11, 106:6–10; Doe 50-h Tr. Defs.' Ex. B at 633:8– 16. Markov's behavior made Doe "feel very uncomfortable" and "harassed." Doe Dep. Pl.'s Ex. C at 100:23–25, 101:25–102:1; Doe 50-h Tr. Defs.' Ex. B at 633:21–22. Doe's testimony also contains circumstantial evidence that Markov sought to intimidate her. According to Doe, Markov laughed at her in front of four to eight or more other male police officers, who giggled and whose behavior suggested they did not believe her allegations. *See* Doe Dep. Pl.'s Ex. C at 102:23–25, 103:24–104:2; Doe 50-h Tr. Defs.' Ex. B at 629:20–23; Doe Dep. Defs.' Ex. C at 98:1–2, 98:22– 24. He also implied that she had previously been raped, reported a rape, or complained about police officers by asking her around four times "don't [you] have a situation like this already[?]" and by posing a similar question to her mother. Doe Dep. Pl.'s Ex. C at 101:5–7, 116:12–14. Doe testified that she did not have a prior "similar situation." *Id.* 116:15–18. Markov denied making these comments. Markov Dep. Pl.'s Ex. F at 108:8–19; 123:12–21. Finally, a reasonable jury could find that Markov spoke to Doe in Russian as an intimidation tactic. *See* Doe Dep. Pl.'s Ex. C at 116:22; Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. 12, ECF No. 102 ("Pl.'s Br.").

Doe's testimony that nobody from Markov's precinct threatened or intimidated her does

not conclusively resolve the issue of whether Markov did, in fact, act from an improper motive. *See* Doe Dep. Pl.'s Ex. C at 100:15–17. First, the wealth of circumstantial evidence set forth above evinces a motive to intimidate, regardless of Doe's characterization of that evidence. Second, Doe testified to additional facts that imply she did perceive Markov as intimidating her. When asked what the officers at the hospital did "to threaten and intimidate" her, she responded that their "questions" were not "proportioned" and then described some of Markov's behavior. *Id.* 115:24–116:14.

Further, a reasonable jury could find that Markov at least implied that she should not file a complaint against his fellow police officers, which would suggest that he did not have a motive to investigate her rape and instead sought to prevent the exercise of her First Amendment right to file a complaint. It is true that Doe vacillated between testifying that Markov told her not to file a complaint and acknowledging that she might have previously told the District Attorney that no one from Markov's precinct told her not to file a complaint. *See id.* 99:9–13, 99:24–100:14. However, her elaboration on how Markov told her not to file a complaint—by asking "[a]re you sure you should be going through with this[?] Are you sure they were police officers[?] How are you so sure[?]"—is consistent with her elaboration on why she might have said what she did to the District Attorney: that the officers at the hospital "basically" told her not to file a complaint by asking "why you are going through with this[?] Are you doing this[?]" *Id.* 99:9–17, 100:9–14. Even if Markov did not explicitly instruct Doe not to file a complaint, Doe's testimony supports the inference that he at least implied as much by repeatedly asking her why she was pursuing the matter.

Based on Markov's testimony alone, he could have acted from a proper motive—to investigate a rape, and not to stifle Doe's speech. However, Doe has proffered evidence that would

16

allow a reasonable jury to find that Markov sought not to investigate her rape, but rather to deter her from pursuing charges against his fellow police officers. Whether Markov acted from a retaliatory motive is, therefore, a genuine issue of material fact.

B. <u>Whether Markov's actions caused Doe injuries sufficient to support a First Amendment retaliation claim is a genuine issue of material fact.</u>

The third and final element of the First Amendment retaliation claim is that "the defendant's actions" must have "caused [the plaintiff] some injury." *Dorsett*, 732 F.3d at 160. The defendants raise three arguments related to this element.

First, the defendants argue that Markov did not chill Doe's speech. Second, seemingly conceding that the First Amendment retaliation claim does not require proof of chilled speech, the defendants argue that emotional damages do not satisfy the injury element. Third, the defendants argue that even if emotional damages can suffice, Doe's emotional damages in this case do not. I address each of these arguments in turn.

i. *Doe does not need to show that Markov actually chilled her speech.*

The defendants argue that "plaintiff's claim . . . fails because she cannot demonstrate that her speech has been chilled[,]" as she ultimately did bring rape charges against Hall and Martins. Defs.' Br. 8. However, to succeed on her First Amendment retaliation claim, Doe need only show that "the defendant's actions caused [her] some injury" and not that the defendant's actions actually chilled her speech. *Dorsett*, 732 F.3d at 160. Thus, I do not decide whether Doe can show that Markov actually chilled her speech, and summary judgment on this issue is not appropriate.

ii. *Emotional damages can suffice to support a First Amendment retaliation claim.*

Next, the defendants raise the legal argument that emotional damages cannot satisfy the injury element. *See* Defs.' Br. 9.

In my August 2018 decision on the defendants' motion to dismiss, I reasoned that, based

on the language in *Dorsett*, 732 F.3d at 160, "the Second Circuit now requires private citizens raising First Amendment claims to show only a concrete harm sufficient to constitute an 'injury in fact' sufficient for standing," *Doe v. City of New York*, No. 18-cv-670 (ARR) (JO), 2018 WL 3824133, at *13 (E.D.N.Y. Aug. 9, 2018). Although an injury in fact must be "concrete," it does not need to be "tangible." *Id.* at *14 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)). To determine "whether an intangible harm constitutes injury in fact . . . ," the Supreme Court of the United States has deemed it "instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at *14 (quoting *Spokeo*, 136 S. Ct. at 1549). Accordingly, I concluded that "[e]motional distress of the type alleged by Doe is a concrete harm sufficient to meet the injury-in-fact requirement for Article III standing" because "it is the harm underlying the common-law tort of intentional infliction of emotional distress[,]" and "it is well-established that 'compensatory damages may include . . . personal humiliation, and mental anguish and suffering.'" *Id.* at *14 (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)).

The defendants cite no authority that undermines this analysis. Instead, they argue that I relied on out-of-circuit decisions to reach a conclusion contrary to Second Circuit law. *See* Defs.' Br. 9. First, I did not rely on the out-of-circuit decisions that the defendants cite and instead concurred with other circuits for the reasons set forth above. *See Doe*, 2018 WL 3824133, at *13. Second, the defendants misconstrue the Second Circuit authority that they cite. In *Zherka*, the Second Circuit reasoned that its "requirement of actual chilling or concrete harm *in this particular type of retaliation case* demands more than the test applied by our sister circuits." *Zherka v. Amicone*, 634 F.3d 642, 647 n.9 (2d Cir. 2011) (emphasis added). The "particular type of retaliation case" to which the court referred was a case where the plaintiff alleged defamation *per*

*se* and no actual injury—the type of retaliation case before it in *Zherka*. *Id.* at 645. In fact, the court explicitly stated that "the presumed injury of New York's theory of *per se* defamation is inadequate" while declining to "decide if allegations of emotional and psychological harm would establish a compensable injury in a First Amendment retaliation claim." *Id.* at 646–47. Thus, *Zherka* forecloses a First Amendment retaliation suit only when the plaintiff claims defamation *per se*—that is, where the law presumes injury—and no other concrete harm, and does not foreclose such a suit in cases like the instant one.

Because emotional damages can constitute sufficient injury to support a First Amendment retaliation claim, summary judgment is not warranted simply because Doe has not shown that she suffered any other harms as a result of Markov's actions.

### iii. *The parties dispute facts material to whether Doe's claimed emotional injuries are sufficient.*

The defendants next argue that Doe's alleged emotional injuries resulting from Markov's actions do not rise to a level above "[h]urt feelings or a bruised ego," which the court in *Zherka* described as "not by themselves the stuff of constitutional tort." 634 F.3d at 645–46; *see* Defs.' Br. 10–11. While this phrase was dicta in *Zherka*, even assuming, without deciding, that it is the proper standard for evaluating emotional injuries, the record contains factual disputes that preclude summary judgment.

Some of Doe's testimony suggests that it was the rape that caused her emotional harm, raising the possibility that Markov's actions did not "cause[] [her] some injury." *Dorsett*, 732 F.3d at 160. At her deposition, Doe testified that "[t]he rape" caused her emotional injuries, though she was identifying the rape as opposed to Hall and Martins' initial *stop* as the cause of her injuries and did not necessarily rule out Markov's behavior as an additional source of harm. Doe Dep. Defs.' Ex. C at 132:1–5. Doe testified that she "[did not] know which" of her emotional injuries

Markov caused at the hospital. *Id.* 132:6–8. In addition, she testified that even if Markov had not behaved in the way that she testified he did, she thought she would have nonetheless suffered the emotional injuries that the rape caused. *See id.* 132:12–15. She also stated that her lawsuit "[is] not really about Markov," although an attorney interrupted before she could explain this comment. *Id.* 169:25–170:4.

However, Doe's testimony also implicates Markov's behavior as one, even if not the only, cause of her emotional injuries, and it describes her injuries as sufficiently concrete to establish a First Amendment retaliation claim. In response to a question asking whether she "sustain[ed] any damages as a result of this incident," Doe testified that she sustained "mental[]" damages. Doe Dep. Pl.'s Ex. C at 126:25–127:2. She elaborated that she lost her interests and trust in people and that she does not "want to be around people anymore." *Id.* 127:4–5, 128:14–16. She also visited a therapist or counselor for the first time in her life after "this incident." *Id.* 123:6–11. With this testimony, Doe indicated that the "incident" in general had the effect that she described without apportioning harm between Hall, Martins, and Markov. Such testimony permits the inference that Markov contributed to the harms that she suffered. *See McLee*, 109 F.3d at 134 (requiring that I "draw all permissible factual inferences" in plaintiff's favor). Further, the emotional harms that Doe described—lack of interest, withdrawing from people, and loss of trust—surpass the mere "[h]urt feelings" that the *Zherka* dicta frames as insufficient to support a First Amendment retaliation claim, especially because they were serious enough for Doe to have sought therapy or counseling. 634 F.3d at 645–46.

Further, Doe's fear in particular could constitute a concrete harm sufficient under the First Amendment retaliation standard. Doe is "scared of being around police officers now." Doe Dep. Pl.'s Ex. C at 127:5–6. She is "fearful nowadays of things that [she] would never have cared to

look twice upon. [Her] mindset has changed about the way [she] look[s] at certain things and the places [she is] in, certain situations with people [she is] with. Everything is just different." *Id.* 128:2–6. Fear is a sufficient emotional harm under the *Zherka* dicta. *See Dingwell v. Cossette*, 327 F. Supp. 3d 462, 473 (D. Conn. 2018) (quoting *Zherka*, 634 F.3d at 645–46) ("[F]ear is an actual injury as it is more than 'hurt feelings or a bruised ego.'").

Thus, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought[,]" I find a genuine issue for trial as to whether Doe's emotional damages suffice to establish a First Amendment retaliation claim. *McLee*, 109 F.3d at 134.

### C. I cannot resolve on summary judgment the issue of whether qualified immunity shields Markov from liability.

The defendants next argue that qualified immunity shields Markov from liability on Doe's First Amendment retaliation claim. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Recent U.S. Supreme Court precedent has parsed the qualified immunity doctrine into two components. First, "[t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). That is, the principle must be "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority[.]'" *Id.* at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42); *see also Sloley v. VanBramer*, 945 F.3d 30, No. 16-4213, 2019 WL 6765762, at *7 (2d Cir. Dec. 12, 2019) (quoting *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010)) ("[T]he 'decisions by this or other courts' must 'clearly fore[shadow] a particular ruling.'"). "The precedent must be clear enough that every reasonable official would interpret it to

establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590 (citing *Reichle*, 566 U.S. at 666).

Second, the legal rule must "clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct at 590. A court must conduct this analysis with "a high 'degree of specificity[,]'" *id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)), asking "whether the official acted reasonably in the particular circumstances that he or she faced[,]" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). However, when subjective intent comprises part of the constitutional claim at issue, the Second Circuit allows an alternative analysis: if "an official's conduct [was] objectively reasonable," the plaintiff may avoid summary judgment by "proffer[ing] evidence of direct or circumstantial facts . . . supporting the claim of an improper [subjective] motive[.]" *Blue*, 72 F.3d at 1084; *see also Duamutef v. Hollins*, 297 F.3d 108, 113 (2d Cir. 2002) (citing *Blue*, 72 F.3d at 1082–84) ("[W]e have acknowledged that where the constitutional claim asserted contains a subjective component, a plaintiff may be able to avoid summary judgment on the qualified immunity issue based on the subjective motivations of the defendants."). The First Amendment retaliation claim contains a subjective element—the retaliatory motive, as discussed above. *See Blue*, 72 F.3d at 1082. Finally, "[w]here . . . there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate." *McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir. 1999) (citing *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999)).

Thus, I must first determine whether binding precedent or a robust consensus of persuasive authority dictates that Doe had a First Amendment right. I must then determine whether that First Amendment principle clearly prohibited Markov's conduct in the particular circumstances that he faced.

i. *Case law dictated that Doe had clearly established First Amendment rights.*

Doe's pursuit of a criminal complaint against two police officers for rape implicated several related and clearly established constitutional rights at the time of Markov's conduct in September 2017. First, Doe had a clearly established free speech right to participate in—and, indeed, to initiate—an investigation of criminal charges against police officers. The Second Circuit has found that a plaintiff police officer "clearly was exercising his right to free speech when he cooperated with the F.B.I. and when he testified against his fellow officer in court." *Dobosz v. Walsh*, 892 F.2d 1135, 1141 (2d Cir. 1989). Accordingly, the police official who allegedly retaliated against him did not enjoy qualified immunity, as "the proscription of retaliation for a plaintiff's exercise of First Amendment rights has long been established[.]" *Id.* at 1141–42. While *Dobosz* suggests that the clearly established constitutional rule is the prohibition of First Amendment retaliation, a subsequent Second Circuit decision rejecting a qualified immunity defense interpreted *Dobosz* as clearly establishing a more specific rule: "it was clearly established . . . that a municipal policeman cooperating with the FBI in an investigation of charges against another policeman was exercising his First Amendment right to free speech[.]" *Vasbinder v. Ambach*, 926 F.2d 1333, 1341 (2d Cir. 1991). It follows that a private citizen initiating criminal charges against police officers has an even more obvious free speech right for two reasons. First, private citizens enjoy a more absolute freedom of speech than that of public employees like the police officer plaintiff in *Dobosz*; a public employee's speech on matters of public concern, for example, falls subject to a special balancing test between the interest of the public employer "in the efficient performance of its duties" and the employee's interest in speaking. *Vasbinder*, 926 F.2d at 1339 (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). Second, if the First Amendment protects cooperation in the investigation of an existing criminal complaint against a police officer, then

surely it protects the initiation of such a complaint in the first place.

In addition, Doe had a clearly established right under the First Amendment's petition clause to file a criminal complaint with Markov, a law enforcement officer. In 1994, the Second Circuit clearly pronounced that "[t]he rights to complain to public officials and to seek administrative and judicial relief are protected by the First Amendment." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988)). This principle has its source in the petition clause. *See Gagliardi*, 18 F.3d at 194–95 (citing *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)). As early as 1967, the U.S. Supreme Court proclaimed that the right "to petition for a redress o[f] grievances [is] among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers*, 389 U.S. at 222. The Court has further pronounced that "[c]ertainly the right to petition extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Relying in part on *United Mine Workers*, the U.S. District Court for the Southern District of New York has rejected a motion to dismiss on qualified immunity grounds, deeming it "axiomatic 'that filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right' to petition government for the redress of grievances." *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 692, 695–96 (S.D.N.Y. 2004) (quoting *Lott v. Andrews Ctr.*, 259 F. Supp. 2d 564, 568 (E.D. Tex. 2003)); *see also Meyer v. Bd. of Cty. Comm'rs of Harper Cty.*, 482 F.3d 1232, 1243 (10th Cir. 2007) (quoting *Estate of Morris*, 297 F. Supp. 2d at 692) ("We thus conclude that 'filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right' to petition the government for the redress of grievances."); *Gable v. Lewis*, 201 F.3d 769, 772 (6th Cir. 2000) (finding it clearly established that petition clause protects filing sex discrimination complaint with highway patrol); *United States v. Hylton*, 710

F.2d 1106, 1111 (5th Cir. 1983) (concluding that filing factually accurate, nonfraudulent criminal complaint against federal agents with local law enforcement officers was exercise of right to petition for redress of grievances); *Kollock v. Torres*, No. 3:14–cv–369 (VAB), 2015 WL 1525688, at *5 (D. Conn. Apr. 2, 2015) (citing *Estate of Morris*, 297 F. Supp. 2d at 692) (rejecting qualified immunity defense because reasonable officer would have understood that interfering with attempt to report crime violated constitutional right); *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 550 (N.D. Ill. 2011) (quoting *Meyer*, 482 F.3d at 1243) ("The reporting of a crime to police officers 'constitutes an exercise of the First Amendment right to petition the government for the redress of grievances.'"); *Low v. City of Sacramento*, No. 2:10–cv–01624 JAM KJN PS, 2010 WL 3714993, at *5 (E.D. Cal. Sept. 17, 2010) (quoting *Meyer*, 482 F.3d at 1243) (applying principle "that filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right to petition the government for the redress of grievances"); *Jones v. Pore*, No. 06–3096–PA, 2007 WL 1875653, at *4 (D. Or. Jun. 26, 2007) (citing *Estate of Morris*, 297 F. Supp. 2d at 692) (explaining that rights under petition clause include right to pursue criminal complaint); *Jackson v. State*, 381 F. Supp. 2d 80, 89 (N.D.N.Y. 2005) (quoting *Lott*, 259 F. Supp. 2d at 568) (stating rule that "[i]t is axiomatic 'that filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right' to petition government for the redress of grievances.").

The Second Circuit has further articulated similar First Amendment rights. For example, "a citizen who has truthfully reported a crime has the indisputable right to reject pressure from the police to have him rescind his accusation and falsely exculpate the accused." *Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011). Thus, "it [was] clear that the First Amendment protects the rights of a citizen to refuse to retract a report to the police that he believes is true, to refuse to make a

statement that he believes is false, and to refuse to engage in unlawful conduct by filing a false report with the police." *Id.* While *Jackler* did not decide the issue of qualified immunity, the court made the "observation[]" that at least as long ago as 2006, "it had been clearly established that the First Amendment protected a citizen's decision both as to what to say and what not to say . . . ." *Id.* at 243.

Finally, "[t]he right to criticize public officials is at the heart of the First Amendment's right of free speech." *Kaluczky v. City of White Plains*, 57 F.3d 202, 210 (2d Cir. 1995) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 282 (1964)). Indeed, the "right to criticize the police without reprisal" is "clearly" an "interest protected by the First Amendment," *Kerman v. City of New York*, 261 F.3d 229, 241–42 (2d Cir. 2001), as "[t]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers[,]" *id.* at 242 (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)). Thus, on summary judgment, the Second Circuit has held that a plaintiff established a First Amendment retaliation claim when he proffered facts showing that police officers retaliated against him for making derogatory comments to the officers and for threatening to sue them. *Kerman*, 261 F.3d at 241–42.[3]

The defendants' cited cases are inapposite. In *Town of Castle Rock v. Gonzales*, the U.S. Supreme Court held that "for purposes of the Due Process Clause," the respondent did not "have a property interest in police enforcement of [a] restraining order against her husband." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005); *see* Defs.' Br. 12 (citing *Gonzales*). Here, Doe does not allege a due process violation or claim that Markov interfered with a constitutionally-

---

[3] The Second Circuit in *Kerman* did not explicitly analyze qualified immunity with respect to the First Amendment retaliation claim, but it reversed the district court's grant of summary judgment to one defendant when the district court's decision had rested, as one of two alternative grounds, on qualified immunity. *See* 261 F.3d at 241–42.

recognized property interest. Nor does she allege that Markov failed to enforce an existing restraining order. Instead, she claims that Markov retaliated against her for trying to lodge a criminal complaint in the first place. *Gonzales* therefore has no bearing on whether Doe had a clearly established First Amendment right. The *Gonzales* Court also quoted *Linda R.S. v. Richard D.*, recognizing that "[i]n other contexts, we have explained that 'a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.'" *Gonzales*, 545 U.S. at 767 n.13 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)); *see* Defs.' Br. 12 (quoting the same). In *Linda R.S.*, the Court held that a plaintiff lacked standing to pursue an injunction that would require a district attorney to prosecute a particular person under a criminal statute. *See* 410 U.S. at 616–19. Here, the defendants do not dispute that Doe has standing, and Doe does not seek to "contest the policies of [a] prosecuting authority[,]" as did the plaintiff in *Linda R.S. Id.* at 619. Thus, *Linda R.S.* does not stand for the proposition that Doe lacked a clearly established First Amendment right to pursue a complaint against Hall and Martins for rape.

Therefore, at the time of Markov's conduct, case law dictated that Doe had clearly established rights under the First Amendment.

    ii.  *Genuine disputes of material fact preclude summary judgment on the issue of whether the law clearly prohibited Markov's conduct in the particular circumstances before him.*

Disputes of fact preclude me from deciding on summary judgment whether Markov acted objectively reasonably in his particular circumstances. *See Wesby*, 138 S. Ct. at 590. The defendants argue that it is reasonable for a police officer to question a crime victim in order to assess her reliability and ascertain the identities of her assailants. *See* Defs.' Br. 13. Indeed, Markov testified that he questioned Doe to determine whether her alleged rapists were, in fact, police officers and to gather information regarding their identities because Doe did not know them

personally. *See* Markov Dep. Defs.' Ex. F at 198:9–13, 199:25–200:3. However, Doe's proffered facts show Markov doing much more than asking questions to verify her allegations. According to Doe, Markov: (1) told her that she did not look like she had just been raped, Doe 50-h Tr. Defs.' Ex. B at 633:13–14; (2) commented that she was "not crying," *id.* 633:12–13; (3) smirked and laughed at her in front of several other male police officers, *id.* 633:14–16; Doe Dep. Pl.'s Ex. C at 102:23–25, 103:24–104:2; (4) tried to convince her that her rapists were not police officers, *see* Doe 50-h Tr. Defs.' Ex. B at 633:15–16; (5) falsely implied around four times that she had been raped, reported a rape, or complained about police officers in the past, *see* Doe Dep. Pl.'s Ex. C at 116:13–18, and implied the same to her mother, *see id.* 101:5–7; (6) stated or implied that she should not file a complaint, *see id.* 99:9–17, 100:9–14; and (7) generally "made [her] feel very uncomfortable" and "harassed," *id.* 100:23–25, 101:25–102:1; Doe 50-h Tr. Defs.' Ex. B at 633:21–22. This behavior is far from objectively reasonable for a police officer to display when interviewing a rape victim.

Even if I could conclude that Markov behaved objectively reasonably—which I cannot—Doe has proffered "circumstantial facts . . . supporting the claim of an improper [subjective] motive[,]" as discussed above. *Blue*, 72 F.3d at 1084. She therefore avoids summary judgment on the qualified immunity issue. *See Duamutef*, 297 F.3d at 113.

Thus, a genuine issue of material fact precludes summary judgment on the issue of whether the law clearly prohibited Markov's conduct in the particular circumstances before him. I cannot grant summary judgment on the issue of qualified immunity, or on the First Amendment retaliation claim at all.

### III. Factual issues preclude summary judgment on Doe's *respondeat superior* claim against the City.

I previously interpreted Doe's Third Amended Complaint as bringing a *respondeat*

*superior* claim against the City for false arrest and imprisonment under New York state law, and neither party has disputed this interpretation. *See Doe*, 2018 WL 3824133, at *3 n.2. "New York courts have held municipalities liable under a theory of *respondeat superior* for false arrest[.]" *Graham v. City of New York*, 928 F. Supp. 2d 610, 626 (E.D.N.Y. 2013); *see, e.g.*, *Ackerson v. City of White Plains*, 702 F.3d 15, 22 (2d Cir. 2012) (concluding that state law false arrest claim created liability for city on *respondeat superior* theory). Whether Doe's *respondeat superior* claim against the City can survive summary judgment will depend on whether a reasonable jury could find in her favor on her false arrest and imprisonment claim against Hall and Martins. *See Boyler v. City of Lackawanna*, 765 F. App'x 493, 497 (2d Cir. 2019) (summary order) (concluding municipality could not remain liable on *respondeat superior* theory when individual defendant won summary judgment on underlying false arrest claim); *Graham*, 928 F. Supp. 2d at 626 ("Because Plaintiff has sustained false arrest claims against the Officer Defendants . . . Plaintiff's false arrest . . . claim[] against Defendant New York City survive[s] summary judgment.").

To prove a false arrest or imprisonment claim under New York law, "a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)) (false arrest); *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)) (false imprisonment); *see also Jackson v. City of New York*, 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013) (quoting *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991)) ("Under New York law, the torts of false arrest and false imprisonment are 'synonymous[.]'"). The parties do not dispute that Hall and Martins' confinement of Doe satisfies the first three elements. *See* Pl.'s Br.

17.

The final element of the false arrest claim—whether Doe's confinement was privileged—is at issue. Under New York law, an arrest supported by probable cause is privileged; the defendants bear the burden of proving that the arresting officers had such probable cause. *See Savino*, 331 F.3d at 76 (citing *Broughton*, 335 N.E.2d at 315). However, as the defendants here concede, under New York law "a civil defendant cannot raise a defense of probable cause to a false arrest claim if the arrest was the result of an initially unlawful search or seizure." *Doe*, 2018 WL 3824133, at *4 (citing *Fakoya v. City of New York*, 115 A.D.3d 790, 791 (N.Y. App. Div. 2014); *Gantt v. Cty. of Nassau*, 651 N.Y.S.2d 541, 542 (N.Y. App. Div. 1996); *Ostrover v. City of New York*, 600 N.Y.S.2d 243, 244–45 (N.Y. App. Div. 1993); *Tetreault v. State*, 108 A.D.2d 1072, 1073–74 (N.Y. App. Div. 1985)); Defs.' Br. 15 n.3. Thus, as I discussed in my prior decision on the motion to dismiss, Hall and Martins must have had at least a reasonable suspicion that Doe was committing a crime or traffic violation—in addition to probable cause to arrest her—in order to invoke the probable cause defense to Doe's false arrest claim. *See Doe*, 2018 WL 3824133, at *6 (citing *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009)); *see also Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (stating rule that to justify traffic stop police officers need reasonable suspicion).

Reasonable suspicion is "'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien*, 574 U.S. at 60 (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). The New York Court of Appeals has similarly defined reasonable suspicion as "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances to believe that criminal activity is at hand." *People v. Sobotker*, 373 N.E.2d 1218, 1220 (N.Y. 1978) (quoting *People v. Cantor*, 324 N.E.2d 872, 877 (N.Y. 1975)).

"The requisite knowledge must be more than subjective; it should have at least some demonstrable roots. Mere 'hunch' or 'gut reaction' will not do." *Sobotker*, 373 N.E.2d at 1220.

The defendants argue that Hall and Martins had, at a minimum, reasonable suspicion that justifies their stop of Doe. First, the defendants argue that Hall, at a minimum, reasonably suspected that Snoopy's car had excessively tinted windows. Second, the defendants argue that the detectives, at a minimum, reasonably suspected that Doe was violating park rules by occupying the Park at night. In connection with this argument, the defendants further assert that even if the detectives mistakenly believed that Doe violated park rules, either New York's common law qualified immunity doctrine or its governmental immunity doctrine shields them from liability. Third, the defendants argue that the detectives reasonably suspected that Doe and her passengers possessed or were consuming illegal drugs. Finally, the defendants argue that probable cause supported Doe's arrest. I will address each of these arguments in turn.

A. <u>A genuine dispute of material fact precludes summary judgment on the issue of whether Hall reasonably suspected that the car Doe was driving had excessively tinted windows.</u>

According to Hall, before stopping Doe, he observed that Snoopy's car had windows tinted in excess of the level that governing ordinances permitted. *See* Hall Dep. Pl.'s Ex. E at 157:3–5, 164:15–18; Hall Dep. Volume II Defs.' Ex. I at 236:5–20. He based his determination that the car had excessively tinted windows on his familiarity with the regulations governing window tints and his experience observing that when he cannot see clearly through a car's windows, the windows are excessively tinted. *See* Hall Dep. Volume II Defs.' Ex. I at 235:10–20.

However, Doe testified that Snoopy's car did not have tinted windows. Doe Dep. Defs.' Ex. C at 57:11–13. The fact that she noticed that the police van *did* have tinted windows shows that she could identify tinted windows, lending support to her assertion that Snoopy's car did not have tinted windows. *See id.* 57:14–15. Doe's testimony undermines Hall's claim that he perceived

tinted windows and makes it less likely that Hall had "a particularized and objective basis for suspecting" that Doe violated the window-tinting law. *Heien*, 574 U.S. at 60. Further, Martins either (1) could not remember at his deposition whether Snoopy's car had tinted windows; (2) did not think that he observed whether Snoopy's car had tinted windows before the stop; or (3) did not think that Snoopy's car had tinted windows—his testimony is unclear. *See* Martins Dep. Pl.'s Ex. D at 121:9–11, 198:6–9. If Hall's fellow detective saw the same windows and could not determine whether they were tinted, or did not think that they were tinted, then a reasonable jury could be less inclined to find that it was objectively reasonable for Hall to have suspected Doe of breaking the window-tinting law.

A dispute of fact therefore precludes a determination on summary judgment of whether Hall had reasonable suspicion, let alone probable cause, that Doe violated the window-tinting law.

B. <u>A reasonable jury could find that the detectives did not have reasonable suspicion that Doe violated park rules, and New York's common law immunities do not shield them from liability.</u>

First, I cannot conclude on summary judgment that the detectives reasonably suspected that Doe violated park rules. Second, I also cannot conclude on summary judgment that New York's common law qualified immunity doctrine shields the detectives from liability. Third, New York's common law governmental immunity doctrine does not shield the detectives from liability because it does not apply to police officers accused of false arrest in Hall and Martins' circumstances.

  i.   *No undisputed facts establish that the detectives reasonably suspected Doe violated park rules.*

By being in the Park at or around 8:00 p.m., Doe would have violated park rules only if a sign indicated that the Park closed before then. Under the park rules, "[p]ersons may enter and use the parks from 6:00 a.m. until 1:00 a.m. unless other open hours are posted at any park." 56 RCNY

§ 1-03(a)(1). Therefore, a New York City park presumptively remains open until 1:00 a.m. unless the City posts a sign displaying different hours. "No person shall enter or remain in any park without the permission of the Commissioner when such park is closed to the public." *Id.* § 1-03(a)(3).

None of the witnesses testified that the Park contained a sign stating any hours of operation. Only one witness—Lieutenant Frank Abbriano—testified that he believed the Park closed at night, but even he had never seen any signs that stated as much. *See* Abbriano Dep. Pl.'s Ex. H at 9:3–10, 59:25–60:9, 60:22–61:9. Doe testified that the Park did not close at dark. Doe 50-h Tr. Defs.' Ex. B at 187:15–17. Markov testified that the Park is open at night, including at 8:00 p.m., and that he had not noticed any signs in the Park at all. Markov Dep. Pl.'s Ex. F at 153:8–23. Espey similarly testified that he had patrolled the Park at night—at various hours, such that he could have been in the Park after 8:00 p.m.—that he had always encountered people in the Park at night, and that the Park had always been open when he patrolled it at night. Espey Dep. Pl.'s Ex. G at 31:2–24. Martins did not recall whether he had seen any signs posting the Park's hours. Martins Dep. Pl.'s Ex. D at 26:9–18.

The detectives' testimony suggests that a sign might limit access to the dirt road in particular, but it does not establish that such a sign prohibited Doe from going there when she did. Martins testified that he believed the dirt road contained a "no trespass" sign. Martins Dep. Defs.' Ex. G at 185:18–21. The presence of a "no trespass" sign would not necessarily mean that Doe violated park rules by driving onto the dirt road. She would not have been trespassing unless she entered the road "without permission[.]" *Kaplan v. Inc. Vill. of Lynbrook*, 784 N.Y.S.2d 586, 588 (N.Y. App. Div. 2004) (quoting *Golonka v. Plaza at Latham LLC*, 704 N.Y.S.2d 703, 706 (N.Y. App. Div. 2000)). Because no witness testified that a sign posted hours for the dirt road other than

6:00 a.m. to 1:00 a.m., and because the defendants have not pointed to any other rules that limit public access within city parks, I cannot conclude that Doe entered the dirt road without permission. In addition, Hall testified that he thought a sign marked the dirt road as a prohibited area but could not recall what the sign said verbatim. Hall Dep. Pl.'s Ex. E at 174:13–19. Again, without knowing under what circumstances accessing the dirt road became prohibited, I cannot conclude that Doe violated any prohibition by entering the dirt road.

The presence of a gate or barrier at the entrance to the dirt road does not make it reasonable to suspect that Doe violated park rules by driving onto the dirt road. It is undisputed that the gate or barrier, if one existed, was open when the detectives stopped Doe. Doe testified that on that night, the gate was open. Doe 50-h Tr. Defs.' Ex. B at 185:14–15. She also testified that on that night, she did not know that driving onto the dirt road was prohibited, and she thought that she could "be in every part" of the Park. *Id.* 207:17–25. Hall also testified that a barrier to the dirt road was open, Hall Dep. Pl.'s Ex. E at 173:23–174:8, though he did describe Doe as driving into a "restricted area," Hall Dep. Volume II Defs.' Ex. I at 218:7–8. When Markov had visited the Park, he had never encountered any physical barriers at all that would block someone from driving onto the dirt road. Markov Dep. Pl.'s Ex. F at 154:16–155:6. It is true that Doe testified that the gate and the dirt road usually closed at night. Doe 50-h Tr. Defs.' Ex. B at 185:14–17, 187:6–14. However, on the night in question she simply drove on an open road in a park that several witnesses testified was open. It would not have been reasonable to suspect that she had violated park rules by doing so.

The defendants also cite the undisputed facts that the dirt road and the unpaved lot at its end were dark and empty as support for their contention that the detectives reasonably suspected that Doe violated park rules. *See* Defs.' 56.1 at ¶¶ 17–21; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 17–21;

Pl.'s 56.1 Counter-Statement ¶ 4; Defs.' Resp. to Pl.'s 56.1 Counter-Statement ¶ 4. That the area was dark and empty does not justify the stop. If City parks remain open until 1:00 a.m. by default, then surely some parks become dark and empty—but nonetheless remain open—at some point in the night. It would not be reasonable to suspect that a person was violating the city's rules simply by remaining in a dark and empty area of a park.

The defendants further argue that even if the detectives "were mistaken as to whether it was unlawful for the plaintiff to be on the dirt road at night, this purported mistake was made in good faith and with a reasonable basis." Defs.' Reply Mem. of Law 7, ECF No. 105. Under U.S. Supreme Court precedent, a reasonable mistake of law can give rise to reasonable suspicion. *See Heien*, 574 U.S. at 57. However, the defendants have cited no facts that explain why it would have been reasonable for the detectives not to be familiar with the park rule prescribing that parks presumptively remain open until 1:00 a.m. absent a sign, or on what basis they believed it was a violation of law to be in a dark area of an open park behind an open gate or possibly no gate at all.

The undisputed facts do not establish that the detectives had "a particularized and objective basis for suspecting" that Doe violated park rules. *Heien*, 574 U.S. at 60; *see Cooper v. Dieugenia*, No. 14-CV-6136 (PKC), 2017 WL 818367, at *4 (E.D.N.Y. Feb. 27, 2017) (denying summary judgment when parties disputed whether sign shortened park's hours). Thus, I cannot conclude on summary judgment that the detectives reasonably suspected that Doe violated park rules.

      ii.     *No undisputed facts establish that the detectives are entitled to qualified immunity under New York common law.*

New York law grants "government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006) (citing *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir. 2004)). As with the federal standard, "an officer's entitlement to qualified

immunity under New York law depends on the reasonableness of his actions." *Alhovsky v. Ryan*, 658 F. Supp. 2d 526, 535 (S.D.N.Y. 2009) (citing *Jones*, 465 F.3d at 64), *aff'd*, 406 F. App'x 535 (2d Cir. 2011) (summary order).

I cannot conclude that Hall and Martins acted reasonably and in good faith. As discussed, no witness testified to a sign stating the Park's hours, and testimony regarding a possible sign restricting access to the dirt road is vague. When the only park rule that the defendants cited states that parks remain open until 1:00 a.m. unless a sign indicates otherwise, a reasonable jury could find that the detectives acted unreasonably when they stopped Doe for being in a Park at 8:00 p.m. Nor does the fact that the area surrounding the dirt road was dark and empty make the detectives' actions reasonable. Thus, the undisputed facts do not establish that the detectives are entitled to qualified immunity under New York common law.

### iii. *Governmental immunity does not shield police officers from liability for false arrest.*

The defendants argue that governmental immunity shields the detectives, and therefore the City, from liability. They cite the New York common law rule of governmental immunity, which states "that when official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice." *Tango v. Tulevech*, 61 N.Y.2d 34, 40 (N.Y. 1983). However, authority counsels against applying this form of immunity to police officers accused of false arrest or municipalities accused of false arrest on a *respondeat superior* theory. *See Jones v. State*, 307 N.E.2d 236, 237–38 (N.Y. 1973) (holding state liable for state trooper's assault and recognizing that "[a] long line of cases has held the State or municipalities liable for the actions of their police officers in the line of duty."); *Rivera v. State*, No. 120113, 2017 WL 9531974, at *3 (N.Y. Ct. Cl. Sept. 12, 2017) ("An intentional tort is not covered by [governmental] immunity[.]"); *Greaves v. State*, 939 N.Y.S. 2d 233, 237 (N.Y. Ct. Cl.

2011) (holding governmental immunity did not apply when plaintiff alleged false imprisonment, an intentional tort); *cf. Arteaga v. State*, 527 N.E.2d 1194, 1197 n.1, 1198 (N.Y. 1988) (granting absolute immunity to correction employees, likening those employees' discretion to that of probation officer in *Tango*, 61 N.Y.2d 34, and distinguishing police officers in *Jones*, 307 N.E.2d 236)). Indeed, the law is clear in this circuit that the City can be liable on a *respondeat superior* theory for false arrest, at least when the arresting officers do not enjoy the common law qualified immunity that requires reasonableness and good faith, as discussed above. *See, e.g.*, *Ackerson*, 702 F.3d at 22; *Graham*, 928 F. Supp. 2d at 626. Thus, the common law qualified immunity standard analyzed above—shielding officers from liability unless they act in bad faith and without a reasonable basis—governs, and the form of governmental immunity that the defendants argue for here does not. *See Graham*, 928 F. Supp. 2d at 625 (citing cases) ("The standard for determining whether police officers enjoy immunity for false arrest and assault and battery actions is the same under state law as it is under federal law."); *Gomez v. City of New York*, No. 05 Civ. 2147(GBD)(JCF), 2007 WL 5210469, at *12 (S.D.N.Y. May 28, 2007) (announcing that "[w]hile it is true that in effecting an arrest, a police officer must exercise some discretion, the routine duties of police officers are not subject to the same level of immunity afforded to high-level decisionmakers" and applying form of qualified immunity requiring good faith and reasonable basis), *report and recommendation adopted by* 2008 WL 3833811 (S.D.N.Y. Aug. 14, 2008).

It is axiomatic that in order to enjoy immunity for their actions, police officers must act reasonably. This principle underlies both the qualified immunity that federal officers enjoy with respect to claims brought under 42 U.S.C. § 1983 and the New York common law qualified immunity that requires that officers act in good faith and with a reasonable basis. If the form of immunity that the defendants argue for applied, a police officer could conduct herself however

unreasonably as she pleased while making a stop, without fearing liability, simply because she used her discretion to decide to conduct the stop in the first place.

The defendants cite no authority that applies the form of governmental immunity that they argue for to a police officer sued for false arrest, or a municipality sued for false arrest on a *respondeat superior* theory. *See Denis v. Town of Haverstraw*, 852 F. Supp. 2d 405, 415 (S.D.N.Y. 2012) (holding government immunity applied in negligence case because officer exercised discretionary function in directing plaintiff to move his car); *Estate of Rosenbaum ex rel. Plotkin v. City of New York*, 982 F. Supp. 894, 896 (E.D.N.Y. 1997) (applying governmental immunity when police strategy failed to protect members of public from riot); *Mon v. City of New York*, 579 N.E.2d 689, 690 (N.Y. 1991) (holding governmental immunity protected City from liability in negligent hiring claim); *Tango*, 61 N.Y.2d at 39–42 (applying governmental immunity in negligent performance of duties claim); *Sean M. v. City of New York*, 20 A.D.3d 146, 150–51, 158 (N.Y. App. Div. 2005) (analyzing governmental immunity in context of failure to respond to charges of abuse and neglect of child). Even *Cerbelli*, which, on summary judgment, granted governmental immunity when police officers committed assault and battery, only did so because the officers acted reasonably; the court declined to grant governmental immunity to two officers who might have unreasonably used physical force. *See Cerbelli v. City of New York*, No. 99 CV 6846, 2008 U.S. Dist. LEXIS 109341, at *76–80 (E.D.N.Y. Sept. 8, 2008), *report and recommendation adopted by* 2008 U.S. Dist. LEXIS 77335 (E.D.N.Y. Sept. 30, 2008).[4]

---

[4] *Cerbelli* applied governmental immunity when police officers committed assault and battery— intentional torts. As discussed above, the New York Court of Claims has determined that governmental immunity does not apply to intentional torts. *See Rivera*, 2017 WL 9531974, at *3; *Greaves*, 939 N.Y.S. 2d at 237. I do not need to resolve whether governmental immunity applies to intentional torts, as I have already determined that it does not apply to the police officers accused of false arrest in this case. Nonetheless, I note that *Cerbelli* and the instant case are factually distinct. In *Cerbelli*, the plaintiff alleged assault and battery after he entered a police precinct high

Thus, a reasonable jury could find that the detectives did not have reasonable suspicion that Doe violated park rules, and the common law immunities do not shield them from liability.

C. The defendants have not set forth a sufficient basis for reasonable suspicion that Doe and her passengers possessed or consumed illegal drugs.

The defendants next argue that Hall and Martins reasonably suspected that Doe and her passengers possessed or consumed illegal drugs. They contend that the following facts support this argument: (1) Hall and Martins knew the Park as a "drug prone location," Defs.' 56.1 at ¶ 9; Pl.'s Resp. to Defs.' 56.1 at ¶ 9; (2) in Martins' experience, the unpaved lot at the end of the dirt road saw even higher levels of drug activity than did other areas of the Park, Defs.' 56.1 at ¶ 25; Pl.'s Resp. to Defs.' 56.1 at ¶ 25; (3) the detectives had previously made drug arrests in the Park, *see* Martins Dep. Defs.' Ex. G at 195:3–12; Hall Dep. Volume II Defs.' Ex. I at 231:2–15; (4) the detectives had seen people use drugs in the Park, Defs.' 56.1 at ¶¶ 10–11; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 10–11; (5) earlier in the night of Doe's stop, the detectives had stopped another vehicle in the Park because they smelled marijuana emanating from it—though I note that, according to Hall, they did not issue any summonses or arrest anyone because they could not find any marijuana in the car, Hall Dep. Volume II Defs.' Ex. I at 214:11–215:12, 216:3–9; and (6) the dirt road and the lot at its end were dark and empty, *see* Defs.' 56.1 at ¶¶ 17–21; Pl.'s Resp. to Defs.' 56.1 at ¶¶ 17–21; Pl.'s 56.1 Counter-Statement ¶ 4; Defs.' Resp. to Pl.'s 56.1 Counter-Statement ¶ 4. In sum, the defendants assert that the detectives became suspicious because they saw Doe driving toward a particularly high-crime area of a high-crime park at night.

---

on cocaine, screaming, and carrying a knife, and police officers stunned him with a Taser and shot him. *See* 2008 U.S. Dist. LEXIS 109341, at *4–10. In the relevant claim in this case, Hall and Martins (1) allegedly committed false arrest, a different tort, and (2) might have conducted an unreasonable stop on their own initiative, unlike the officers granted immunity in *Cerbelli*, who acted reasonably in response to an emergency.

The U.S. Supreme Court has explicitly announced that such circumstances, without more, do not give rise to reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *Brown v. Texas*, 443 U.S. 47, 52 (1979)) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."); *Brown*, 443 U.S. at 52 ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."). The Supreme Court and courts in this circuit have considered presence in a high-crime area at night as one circumstance that may *contribute* to reasonable suspicion, but they have consistently required more to justify a stop. *See Wardlow*, 528 U.S. at 124–25 (concluding that presence in high-crime area plus unprovoked flight from police amounted to reasonable suspicion); *United States v. Simmons*, 560 F.3d 98, 108 (2d Cir. 2009) ("It is a relevant consideration, though by no means dispositive, that the officers, upon arrival, encountered Simmons along with a gathering of people at the apartment building, late at night, and in a high-crime area."); *United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006) (finding reasonable suspicion when officers responded to 9-1-1 call around 1:00 a.m. to find defendant alone in empty high-crime area, close to crime scene, just minutes after reported burglary attempt, staring at police car, and walking along route computer system had identified as where suspect would be); *United States v. Bold*, 19 F.3d 99, 103 (2d Cir. 1994) (considering location of car in remote area of parking lot as one circumstance in reasonable suspicion analysis but basing reasonable suspicion finding on several additional suspicious circumstances); *United States v. Monroe*, No. 08–CR–609 (ENV), 2009 WL 3614521, at *5 (E.D.N.Y. Nov. 2, 2009) (reasoning that presence on especially notorious street corner in high-crime area did not justify stop on its own but could factor into reasonable suspicion analysis).

The defendants are plainly wrong when they assert that "there was no discernible, lawful reason for any member of the public to be traveling down the dirt road to the lot at that time." Defs.' Br. 23. If, in fact, the Park and the dirt road were open to the public that night, then it was discernibly lawful to simply be present there.

The defendants also cite the facts that (1) Doe had previously smoked marijuana in the Park, Defs.' 56.1 at ¶ 12, Pl.'s Resp. to Defs.' 56.1 at ¶ 12; and (2) Doe and her passengers went to the Park that night to smoke marijuana, Defs.' 56.1 at ¶ 3. First, Doe disputes the latter fact. *See* Pl.'s Resp. to Defs.' 56.1 at ¶ 3. Second, these facts, even if they were both undisputed, are irrelevant to whether the detectives reasonably suspected that Doe and her passengers possessed or were consuming drugs in the Park before they stopped her, as the defendants have not pointed to any facts that suggest the detectives knew about Doe's prior smoking habits or her plan for the night of September 15.

Thus, I cannot conclude on summary judgment that the detectives reasonably suspected that Doe and her passengers possessed or consumed illegal drugs.

D. Because I cannot conclude on summary judgment that reasonable suspicion supported the stop, I do not need to decide whether probable cause supported the arrest.

Under New York law, the defendants cannot raise the probable cause defense to false arrest "if the arrest was the result of an initially unlawful search or seizure." *Doe*, 2018 WL 3824133, at *4 (citing *Fakoya*, 115 A.D.3d at 791; *Gantt*, 651 N.Y.S.2d at 542; *Ostrover*, 600 N.Y.S.2d at 244–45; *Tetreault*, 108 A.D.2d at 1073–74); Defs.' Br. 15 n.3. Because a reasonable jury could find that the detectives' stop of Doe was an unlawful seizure for lack of reasonable suspicion, there is an issue of material fact as to whether the probable cause defense is even available for the defendants to raise. Thus, I do not need to decide on summary judgment whether probable cause supported the arrest.

Factual issues preclude dismissal of Doe's *respondeat superior* claim against the City on summary judgment.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is denied.

SO ORDERED.

_____/s/_____
Allyne R. Ross
United States District Judge

Dated:      January 9, 2020
            Brooklyn, New York